854 A.2d 936 (2004)
371 N.J.Super. 562
In the Matter of the CIVIL COMMITMENT OF E.S.T.
Superior Court of New Jersey, Appellate Division.
Submitted June 3, 2004.
Decided August 9, 2004.
*937 Yvonne Smith Segars, Public Defender, attorney for appellant (Thomas G. Hand, Designated Counsel, of counsel and on the brief).
Peter C. Harvey, Attorney General, attorney for respondent State of New Jersey (Patrick DeAlmeida, Assistant Attorney General, of counsel; Mary Beth Wood and *938 Carolyn Grace Labin, Deputy Attorneys General, on the brief).
Before Judges CARCHMAN, WECKER and WEISSBARD.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
E.S.T. appeals from a judgment committing him to the Special Treatment Unit (STU) pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. We conclude that the testimony of the experts on behalf of the State at the initial commitment hearing, N.J.S.A. 30:4-27.29, relied to an unacceptable extent upon hearsay opinions and findings by other experts that E.S.T. did not have the opportunity to challenge, resulting in a commitment process that was fundamentally unfair.
The facts underlying E.S.T.'s commitment are not pleasant, as is commonly the case with SVPA committees. The crimes that led to E.S.T.'s present commitment all took place in the summer of 1985. On May 26, 1985, E.S.T., who was then twenty-three years old, entered a home and, at knife point, raped a young woman after first forcing her to perform oral sex on him. On July 25, 1985, E.S.T. entered another home and, again at knifepoint, forced a young woman to perform an oral sex act on him. On July 28, 1985, once again armed with a knife, he entered a home and sexually groped a woman, but fled before performing any further sexual act as a result of her screams and fighting.
When subsequently questioned by the police, E.S.T. admitted his involvement in each of those crimes, as well as his participation in robberies on July 18 and July 27, 1985.
On July 29, 1986, pursuant to a negotiated agreement, E.S.T. pled guilty to sexual assault and attempted sexual assault charges arising from the May 26 and July 28, 1985 incidents, and to second-degree robbery stemming from the July 27, 1985 incident. The plea agreement called for various consecutive and concurrent sentences aggregating thirty years with fifteen years of parole ineligibility. E.S.T. was sentenced on that same date in accordance with the negotiated plea. E.S.T.'s sentence did not commit him to the Adult Diagnostic and Treatment Center (ADTC) for sex offender treatment, and there is no indication that the mandatory evaluation was ever made. N.J.S.A. 2C:47-1 to -8; R. 3:21-3. In any event, even if there was such a referral, E.S.T. was not committed to the ADTC.[1] The record does not reflect any appeal of the sentence.
There is no clear evidence that E.S.T. received or was offered any sex offender treatment during his time in State Prison, although he did participate in "anger management and behavior modification modules." E.S.T. served about seventeen years in prison before the State filed its SVPA commitment petition on June 4, 2002. The petition noted that he was scheduled to "max out" on his sentence "on or about June 12, 2002."
E.S.T.'s criminal record prior to the 1985 incidents revealed a burglary and larceny conviction in June 1982 with a thirty-day suspended sentence and two years probation; a municipal court theft, criminal mischief, resisting arrest and simple assault conviction on February 22, 1982, with a sentence of fifteen days in county jail, together with a charge of *939 contempt of court with a three-day county jail sentence on the same date; and finally, a May 28, 1985 arrest for simple assault, which was never adjudicated due to his failure to appear (perhaps because of the pending sex crimes charges). The June 1982 conviction resulted in a September 1983 violation of probation and an indeterminate term at Yardville, from which he was paroled on June 12, 1984, only a year before his 1985 crimes. Indeed, it appears that he was on parole when he committed the 1985 crimes.
In prison, E.S.T. had a July 8, 1992 adjudication of an attempt to commit an unknown infraction, with a sanction of detention and loss of recreational privileges, and a September 1, 1992 adjudication of refusing to obey for which his sanction was a suspended loss of recreational privileges. On August 13, 1997, he was found guilty of possession of drugs and narcotic paraphernalia, with a sanction of detention, recreational segregation, loss of commutation time and urine monitoring.
As noted, the State filed its SVPA petition on June 4, 2002. Supporting the petition were two clinical certificates. The first, by Herbert Kaldany, D.O., a psychiatrist employed by CFG Correctional Medical Services, indicated that he interviewed E.S.T. for forty minutes on June 3, 2002, and reviewed his prison classification record, which included mental health and medical records. He noted that an ADTC report was "not included." (As we have noted, there apparently was no ADTC evaluation). Dr. Kaldany stated that E.S.T. had been referred for sex offender treatment "by various sources from 1988 to 2000." However, the basis for that observation was not set forth. At the interview, E.S.T. denied committing the offenses in question, claiming that the victims concocted their charges, apparently at the instigation of the Camden Police because of racial bias. Dr. Kaldany took account of several psychological risk assessment test results that placed E.S.T. in the "moderate to high risk relapse rate." The primary final diagnosis was "Paraphilia[2] NOS [not otherwise specified] nonconsent type, Polysubstance abuse," with a secondary diagnosis of "Personality [disorder] NOS Antisocial traits most prominent." The doctor checked off the box indicating that defendant qualified for SVPA commitment because he suffers from a "mental abnormality (as defined by the Act) or personality disorder that makes the person likely to engage in acts of sexual violence if not confined to a secure facility for control, care and treatment."
The second certificate supporting the commitment petition was by Benjamin L. Libertore, M.D., a psychiatrist with the Center for Family Guidance/CMS. Dr. Libertore examined E.S.T. on June 3, 2002, for an hour just preceding Dr. Kaldany's interview. He also reviewed E.S.T.'s records, including "psychological evaluations." He stated the following:
[E.S.T.] has received no sex offender specific therapy, substance abuse treatment, or psychiatric treatment.
Treatment for sex offender and substance abuse recommended by parole board 12/00. In addition there were *940 various recommendations for group counseling and substance abuse treatment by classification committees and others. [E.S.T.] did not pursue these.
As he had with Kaldany, E.S.T. claimed that his convictions resulted from an elaborate conspiracy involving the prosecutors and victims. He demonstrated, according to Libertore, "distorted thinking and denial." Libertore also noted his test scores demonstrating a high (on one test) and moderate (on another test) recidivism risk. His primary diagnosis was also "Paraphilia NOS non consenting." He considered that E.S.T. met the criteria for SVPA commitment.
We turn now to the hearing of September 13, 2002, that resulted in the judgment under review. The State presented two witnesses. Dr. Pogas Voskanian, a psychiatrist in a private consulting practice, testified that he interviewed E.S.T. for fifteen to twenty minutes on the day of the hearing. An earlier attempt to interview him had been frustrated by E.S.T.'s indication that he wanted to speak with his attorney. E.S.T. maintained his innocence of the crimes, categorically denying that he committed any of them. In reaching his opinions, Dr. Voskanian relied on his "review of records" generally, but specifically on the evaluations by Drs. Kaldany and Libertore. His opinion, he stated, coincided with that of the "doctors who previously examined" E.S.T. His primary diagnosis of Paraphilia was based on the "deviant manner of committing sexual offenses, meaning rape, violating somebody." He stated:
If you combine disregard for others' rights, as well as your  your desire of having sex with somebody else or violate somebody else or commit a crime or satisfy your need in whatever means, combined with having no remorse or feelings of guilt, and disregard for others' rights; it's going to make [it] a lot easier and the  there's going to be a lot less prohibition for that individual to go ahead and commit the crime.
E.S.T.'s complete denial of the crimes indicated that "it's going to take time ... for him to develop some insight into the problems ... to accept treatment and that indicates that we are at the very beginning stages of beginning the process of some recovery." He concluded that E.S.T.'s risk of reoffense is "high."
On cross-examination, Dr. Voskanian made clear that he based his diagnosis of Paraphilia "upon other individuals' evaluations." Indeed, in his report, which was incorporated into his testimony, the doctor set out the key portions of the two clinical certificates and, as in his testimony, stated that these evaluations played a significant part in his diagnoses.
The State's second witness was Dr. Robert S. Carlson, a psychologist employed at the STU. He interviewed E.S.T. for about one hour and reviewed correctional records from the state prison facility. He related that E.S.T. had participated in several "psychometric evaluations" that showed him to be in the "mildly mentally retarded range." Significantly, in his report and testimony, Dr. Carlson relied upon two actuarial instruments used for risk assessment, see In re Commitment of R.S. 339 N.J.Super. 507, 517, 773 A.2d 72 (App.Div.2001), aff'd, 173 N.J. 134, 801 A.2d 219 (2002), which had been administered to E.S.T. by Gregg Gambone, Ph.D. on December 29, 2001, a date on which Dr. Gambone interviewed E.S.T. as well. A copy of Dr. Gambone's report was also placed in evidence. Carlson's review of the tests showed that E.S.T. obtained a score of eight on the MnSOST-R, which placed him at a high-risk category for sexual reoffense. Gambone's report stated the test result as representing a 70% *941 chance of recidivism.[3] On the Static 99, he received a score of four, suggesting that he belongs to a group that is at medium-high risk for sexual reoffense. Gambone referred to this as equating to a 45% chance of recidivism.[4] While these actuarial instruments are unique in that they "have been designed specifically for ... and with the intention of predicting recidivism," they are "evaluated within the context of the overall evaluation." His conclusion that E.S.T. posed a "significant risk" of reoffense was based on:
an overall pattern of impulsiveness, of lack of control, which he has manifested when in the community setting. And ... it's just not necessarily only sexual behaviors that  that he has had difficulty with, but there is some criminal versatility that he has demonstrated over time. I don't  even though I did not score the Hare PCLR, I don't believe that he would probably meet the diagnostic threshold of  of psychopathy. But, certainly, there are traits that  that one could infer from, again, a careful review of the behavioral history.
Dr. Carlson felt that E.S.T.'s offense denial made it unlikely for him to engage in any meaningful treatment.
The judge found, based on the history of the offenses and the opinions of the experts, that E.S.T. is a sexually violent predator, predisposed to commit sexually violent acts. "He has great difficulty controlling his sexual behavior." She went on to find that "[b]ecause of his denials, he cannot be treated. He cannot develop any insight into his problems. And, therefore, he cannot stop. He is exactly the same as he was when he was first taken into custody during that summer [of 1985]."
On appeal, E.S.T. raises the following issues:
POINT ONE

THE COURT COMMITTED PLAIN ERROR IN RELYING ON HEARSAY CONTAINED IN EXHIBITS AND THE TESTIMONY OF EXPERT WITNESSES IN REACHING ITS DECISION. (Not raised below)
A. THE COURT'S RELIANCE ON THE ERRONEOUSLY ADMITTED HEARSAY WAS PLAIN ERROR.
B. THE HEARSAY EVIDENCE DOES NOT FALL WITHIN ANY RECOGNIZED EXCEPTIONS AND MUST BE EXCLUDED.
1. The Trial Court Improperly Relied On Hearsay Documents To Establish The Facts Of The Offenses.

*942 2. The Trial Court Improperly Relied On Hearsay Provided Through The Expert Witnesses.

POINT TWO
THE STATE FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT E.S.T. WAS A SEXUALLY VIOLENT PREDATOR.
A. The state failed to prove E.S.T. suffered from a mental abnormality
B. The state failed to prove the "serious difficulty" prong of the "Control" requirement of W.Z.
C. The state failed to prove the "highly likely" prong of the "Control" requirement of W.Z.
D. The state failed to prove the "Temporal Context" requirement of W.Z.
E.S.T.'s hearsay objection was not raised before the hearing judge, requiring that we consider it under the plain error standard. R. 2:10-2. In this case, given the magnitude of the interests at stake, see Vitek v. Jones, 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552, 564 (1980) (noting that involuntary commitment to a mental hospital is "a massive curtailment of liberty"), we conclude, for the reasons which follow, that E.S.T.'s commitment based on expert medical testimony that was to a large measure based on hearsay in the form of opinions of other experts who did not testify, was error, and that such error was "clearly capable of producing an unjust result."
There is no doubt that the opinions of both the psychiatrist, Dr. Voskanian, and the psychologist, Dr. Carlson, were based substantially on the opinions of Drs. Liberatore and Kaldany who had authored the clinical certificates. In addition, they relied on the risk assessments conducted by Dr. Gambone. While both witnesses testified that these were the types of information frequently relied upon in making evaluations such as these, thereby arguably complying with N.J.R.E. 703, such facial compliance is not dispositive. Indeed, we question whether there was real compliance with N.J.R.E. 703 or whether the rule was just given lip service. Dr. Voskanian responded affirmatively to a question that asked whether "members of [his] profession will frequently rely upon [such types of source information] in doing such evaluations?" Similarly, Dr. Carlson testified, by way of an affirmative answer, that "these [are the] type[s] of source information that members of your profession will rely upon [such types of source information] in doing such evaluations." The evidence rule requires that the facts or data relied upon must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." In Ryan v. K.D.I. Sylvan Pools, Inc., 121 N.J. 276, 289, 579 A.2d 1241 (1990), the Court held, with reference to identical language contained in Rule 703's predecessor rule, Evidence Rule 56(2), that the trial court is required to "make an inquiry into and a finding on whether experts in the given field rely on certain information. If such reliance be found, then it is presumed to be reasonable." This has been referred to as the "liberal approach" to the rule. McCormick on Evidence, § 15 at 74 (5th ed.1999). In so doing, the Court rejected those federal cases that also required the trial court to determine whether the expert's reliance on the out-of-court information was reasonable. Ryan, supra, 121 N.J. at 287-89, 579 A.2d 1241.
The focus should be on what the experts in fact rely on, not on whether the court thinks they should so rely. Requiring the trial court to make a finding on whether experts in the field actually rely on certain information satisfies the intent of the new language. Allowing the court to overrule that presumption of *943 reliability will result in the exclusion of evidence only under unusual or extreme circumstances, thus satisfying the "spirit" of the former Rule.

[Id. at 289, 579 A.2d 1241].
It is beyond question that medical experts rely upon the opinions of prior treating physicians. However, here, neither Kaldany nor Libertore treated E.S.T. Both had simply performed forensic evaluations, just as Voskanian and Carlson themselves had done. Albeit in the context of a criminal trial, in United States v. Tran Trong Cuong, 18 F.3d 1132, 1143-44 (4th Cir.1994), similar testimony by an expert, bolstering his own opinion by stating that it was "essentially the same" as that of a non-testifying expert, was deemed inadmissible under identical Federal Rule of Evidence 703. The court's ruling had two parts. First, it held that it was improper for the testifying expert to bolster his opinion by stating that another doctor, who was not called to testify, agreed with him. There was also no finding that this type of evidence was the "type reasonably relied upon by experts in the particular field." Id. at 1143. Even if such a foundation had been laid, it was improper to state "that the two medical opinions were essentially the same." Ibid. This is, we suggest, what occurred at E.S.T.'s hearing.
The Fourth Circuit also advanced a second ground upon which the testimony was inadmissible. The expert's report to which the testifying expert referred was itself prepared at the request of the prosecutor and thereby was a forensic opinion. The court concluded that "[r]eports specifically prepared for purposes of litigation are not, by definition, `of a type reasonably relied upon by experts in the particular field.' Even though an expert may base his opinion on underlying information, it does not follow that the otherwise inadmissible information may come into evidence just because it has been used by the expert in reaching his opinion." Id. at 1143-44. The testimony of the expert in court as to the opinion of the out-of-court expert was used to convince the trier of fact of the "accuracy and reliability of [the testifying expert's] opinions," and also to place before the trier of fact the non-testifying expert's opinion without subjecting him to cross-examination. Id. at 1144. "This is unfair to the defendant as it denies his fundamental right to cross-examination and is an improper use of expert testimony." Ibid.
Exactly the same may be said of what took place in the case under review. To repeat, this is not a case where the experts who testified relied upon experts who treated the patient, see e.g., United States v. Lawson, 653 F.2d 299, 301-03 (7th Cir.1981), cert. denied, 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982), but where the non-testifying experts simply rendered a forensic opinion based on records and a brief interview with E.S.T. We agree with the court in Cuong that this type of reliance, even in the context of this non-criminal SVPA proceeding, does not fit within the parameters of N.J.R.E. 703. Nevertheless, it cannot be said that the testifying doctors here merely acted as a "conduit" for the out-of-court opinions, McCormick, supra, § 15, at 76 n. 17, since they did offer their own opinions based, at least in part, on a review of records and an interview, however brief, with E.S.T. Thus, despite our conclusion as to the violation of N.J.R.E. 703, further analysis is required.
As we view it, the infirmity lies in the greatly reduced, if not entirely absent, opportunity for effective cross-examination, a right specifically guaranteed by the SVPA, N.J.S.A. 30:4-27.31, when the experts produced in court and available for cross-examination rely heavily upon the opinions of experts who are not produced. While *944 the experts here did not rely on sources of unknown reliability, as was the case with the committing physician in In re J.B., 295 N.J.Super. 75, 78, 684 A.2d 925 (App.Div.1996), we share similar concerns: that the trier of fact, even an experienced judge, may not be able to fairly evaluate the basis of the in-court opinions that rely upon out-of-court opinions effectively shielded not just from meaningful cross-examination, but from any cross-examination. As the Court observed in In re C.A., 146 N.J. 71, 95, 679 A.2d 1153 (1996), cross-examination is generally a prerequisite to admissibility of statements, subject, of course, to the rule permitting the introduction of hearsay where "`circumstantial guarantees of trustworthiness exist,'" (quoting 2 McCormick on Evidence § 253 at 130 (4th ed.1992)).
In C.A., the Court emphasized the need for reliability in the admission of hearsay evidence as an essential component of "procedural due process and fundamental fairness." Id. at 95, 679 A.2d 1153. As the Court noted, "`relaxed standards for admissibility are not to be equated with automatic admissibility.'" Ibid. (quoting State v. Davis, 96 N.J. 611, 623, 477 A.2d 308 (1984)). We need not cite the many cases that have acknowledged Wigmore's seminal observation that cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 Wigmore on Evidence § 1367 (3rd ed.1940).[5] In the course of an opinion dealing with the need for pre-commitment notice of an SVPA probable cause hearing, N.J.S.A. 30:4-27.28, for individuals already confined to a state facility, Judge Carchman, albeit in dictum, took note of the fact that at the final commitment hearing, "the alleged SVP will have a timely opportunity to challenge the commitment, including, at that time, the right to cross-examine and test the credibility of the certifications that have occasioned the commitment in the first instance." In re Commitment of M.G., 331 N.J.Super. 365, 384, 751 A.2d 1101 (App.Div.2000)(emphasis supplied). We agree with that observation.
As a matter of fundamental fairness, we conclude that the State should be required to produce at the initial SVPA commitment hearing the physicians who signed the clinical certificates supporting the commitment petition, if they are available and if any expert testifying in court intends to rely on the opinions contained in those certificates in rendering an opinion that the individual is subject to commitment under the SVPA. It does not comport with fundamental fairness to have the opinions of the non-testifying experts bootstrapped into evidence through the testimony of the testifying experts without an opportunity for cross-examination of the underlying opinions. The same considerations apply to Dr. Gambone, who performed the critical actuarial assessments relied upon by the testifying experts. It is significant that in an "ordinary" civil commitment, which is also initiated by the *945 submission of two clinical certificates, N.J.S.A. 30:4-27.10b, at the final commitment hearing there must be testimony by a "psychiatrist on the patient's treatment team who has conducted a personal examination of the patient as close to the court hearing date as possible, but in no event more than five calendar days prior to the court hearing." N.J.S.A. 30:27.13b (emphasis supplied). While the witnesses at E.S.T.'s hearing both "examined" him within the appropriate time frame, neither one had treated E.S.T. Indeed, it does not appear that E.S.T. received any treatment in the three months between his initial commitment and the final hearing. Thus, the testifying experts were not even in a position to review treatment records, as was the case in the review hearings at issue in In re Civil Commitment of A.X.D., 370 N.J.Super. 198, 851 A.2d 37 (App.Div.2004). Of course, in A.X.D., we dealt with the admissibility as business records under N.J.R.E. 808 of treatment team reports containing hearsay. While we found the admission of the records to be harmless under the circumstances, we agreed with the committee "that it would have been improper for the trial judge to have considered for their truth any complex diagnoses that may have been contained in these reports, to the extent those diagnoses were contested." A.X.D., supra, at 202, 851 A.2d 37. To the extent that the requirements we impose may prove onerous to the State, such concerns "must yield to the Constitution and due process requirements." In re M.G., supra, 331 N.J.Super. at 385, 751 A.2d 1101; see also In re Commitment of Raymond S., 263 N.J.Super. 428, 431, 623 A.2d 249 (App.Div.1993)("Involuntary commitment to a mental hospital is state action which deprives the committee of important liberty interests and, as such, triggers significant due process requirements.").
Here, E.S.T. complains of the admission of hearsay in the form of the pre-sentence reports and other investigative materials, as well as the expert opinion hearsay included within the expert opinion testimony. With respect to the former, we rejected a similar challenge in In re Civil Commitment of J.H.M., 367 N.J.Super. 599, 611-14, 845 A.2d 139 (App.Div.2003), certif. denied, 179 N.J. 312, 845 A.2d 137 (2004). We follow that decision. See also A.X.D., supra, 370 N.J.Super. at 201-02, 851 A.2d 37. However, upon remand, the trial judge must take pains to consider such hearsay material not as substantive evidence but only as a basis for the expert's opinion. J.H.M., supra, 367 N.J.Super. at 613, 845 A.2d 139; A.X.D., supra, 370 N.J.Super. at 202, 851 A.2d 37. The record in this case leaves us in some doubt as to whether the judge viewed the evidence in that light. However, J.H.M. did not deal with the other issue here concerning the use of hearsay in the form of prior expert opinions, such as those of Drs. Libertore, Kaldany and Gambone. It is that material which results in our reversal in this case.
Although the trial judge placed heavy emphasis upon E.S.T.'s denial of the offenses, which basically rendered him untreatable, finding those denials incredible, there is no doubt that the judge relied upon the expert opinions of Voskanian and Carlson. Indeed, we do not see how her findings could be sustained without expert opinion as to E.S.T.'s risk of reoffense. Otherwise the commitment would be improperly based on E.S.T.'s convictions alone.[6] As a result, it cannot *946 possibly be said that the error we have identified was harmless.
In light of our disposition, we need not address E.S.T.'s argument that the State failed to prove that he was a sexually violent predator. We only note that Dr. Voskanian's opinion came perilously close to saying that E.S.T. should be committed because he committed rapes, which in itself the doctor considered a "deviant manner of committing sexual offenses." He went further and opined that it was E.S.T.'s "disregard for others' rights," as evidenced by the multiple rapes that made him likely to reoffend. We recognize that this was not the entirety of Voskanian's opinion, but it bears emphasis because the fact of the criminal offenses that make E.S.T. eligible for SVPA commitment cannot alone establish the risk of reoffense that permits SVPA commitment. Since the matter will have to be reconsidered, the judge will have the opportunity to consider our observations and clarify the basis for the doctor's opinion. We wish to make clear that at the new commitment hearing the judge may certainly take into account, and if deemed appropriate accord substantial weight to, E.S.T.'s denial of the offenses in the face of his guilty plea and allocution. On remand, the court should also clarify whether and when E.S.T. was offered sex offender treatment in prison. If such treatment was offered and declined, the court may also consider that fact in its evaluation of the risk that E.S.T. will reoffend.[7]
Finally, we note that, unlike some other SVPA committees, E.S.T. did not raise an ex post facto challenge to his commitment. See Doe v. Poritz, 142 N.J. 1, 662 A.2d 367 (1995); State v. Bellamy, 178 N.J. 127, 835 A.2d 1231 (2003). On remand, E.S.T. is free to raise the argument that his commitment is punitive in light of the fact that he spent seventeen years in the penal system without treatment for what the State now apparently contends is a treatable condition. Can it be said, under such circumstances, that anyone holds out a realistic possibility that E.S.T. is now amenable to treatment for a mental condition for which he received no treatment in the years when it might have done him some good, i.e., closer to the time of the offenses? While the record is not entirely clear, it does not appear that sexual offender treatment was suggested to or required of E.S.T. before, perhaps, his December 2000 parole hearing, which we take to have been his first chance for parole.
In Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), a closely divided Supreme Court held that there was no impediment, at least under the federal Constitution, to a state "civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others." Id. at 366, 117 S.Ct. at 2084, 138 L.Ed.2d at 517. In his critical concurring opinion, Justice Kennedy observed that "[i]f the object or purpose of the Kansas law had been to provide treatment but the treatment provisions were adopted as a sham or mere pretext, there would have been an indication of the forbidden purpose to punish," the hallmark of an ex post facto law. Id. at 371, 117 S.Ct. at 2087, 138 L.Ed.2d at 521. However, Justice Kennedy found that the Kansas law, with its various protections, including yearly review, fell within the tradition of permitting confinement of persons who "by reason of a mental disease or mental abnormality, *947 constitute a real, continuing, and serious danger to society." Id. at 372, 117 S.Ct. at 2087, 138 L.Ed.2d at 521. In that regard, he noted that the mental abnormality that led to Hendricks' confinement, pedophilia, "is at least described in the DSM-IV. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 524-525, 527-528 (4th ed.1994)." Ibid. He continued:
Notwithstanding its civil attributes, the practical effect of the Kansas law may be to impose confinement for life. At this stage of medical knowledge, although future treatments cannot be predicted, psychiatrists or other professionals engaged in treating pedophilia may be reluctant to find measurable success in treatment even after a long period and may be unable to predict that no serious danger will come from release of the detainee.
....
The point, however, is not how long Hendricks and others like him should serve a criminal sentence. With his criminal record, after all, a life term may well have been the only sentence appropriate to protect society and vindicate the wrong. The concern instead is whether it is the criminal system or the civil system that should make the decision in the first place. If the civil system is used simply to impose punishment after the State makes an improvident plea bargain on the criminal side, then it is not performing its proper function. These concerns persist whether the civil confinement statute is put on the books before or after the offense. We should bear in mind that while incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone.
On the record before us, the Kansas civil statute conforms to our precedents. If, however, civil confinement were to become a mechanism for retribution or general deterrence, or if it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it.
[Id. at 372-73, 117 S.Ct. at 2087, 138 L. Ed.2d at 521-22 (Kennedy, J., concurring)].
Four dissenting Justices agreed with the Kansas Supreme Court that Hendricks' confinement was not justified, finding inadequate evidence that Kansas intended the committees to receive treatment. Among the reasons supporting such a view was that the Kansas Act, like ours, only seeks civil confinement after the offender has served his or her criminal sentence, leading Justice Breyer to pose the rhetorical question, "But why, one might ask, does the Act not commit and require treatment of sex offenders sooner, say soon after they begin to serve their sentences?" Id. at 385, 117 S.Ct. at 2093-94, 138 L.Ed.2d at 530 (Breyer, J., dissenting). It is, he went on, "difficult to see why rational legislators ... would write the Act in this way  providing treatment years after the criminal act that indicated its necessity." Id. at 386, 117 S.Ct. at 2094, 138 L.Ed.2d at 530. Based primarily upon a conclusion that Kansas had not provided for treatment of persons committed under its Act, like Hendricks, the dissenters concluded that the Act imposed punishment and therefore violated the ex post facto clause of the Constitution. Id. at 382-96, 117 S.Ct. at 2092-98, 138 L.Ed.2d at 528-36.
Since the matter has not been briefed and the present record is in any event inadequate, we express no view on whether E.S.T. can establish that his commitment is in reality punitive. This is not to say that individuals like E.S.T. who commit terrible crimes should go free, but *948 simply to suggest that the solution may lie in an honest use of criminal sentencing to achieve an appropriate period of confinement rather than use  or abuse  of the civil commitment statute to remedy the situation. The problem also suggests that treatment for sex offenders not committed to the ADTC be mandatory even while serving a state prison term.
Reversed and remanded for a new commitment hearing consistent with the views expressed herein.
NOTES
[1] We have just held that even a finding by the ADTC that a defendant is not eligible for sex offender sentencing does not preclude a later civil commitment of that defendant under the SVPA. In re Civil Commitment of J.S.W., 371 N.J.Super. 217, 852 A.2d 1107 (App.Div.2004).
[2] Paraphilia is variously defined as "[a]ny group of psychosexual disorders characterized by sexual fantasies, feelings, or activities involving a nonhuman object, a nonconsenting partner such as a child, or pain or humiliation of oneself or one's partner. Also called sexual deviation." The American Heritage Dictionary of the English Language (4th ed.2000); and "[a] pattern of recurring sexually arousing mental imagery or behavior that involves unusual and especially socially unacceptable sexual practices (as sadism, masochism, fetishism, or pedophilia)." Merriam-Webster Medical Dictionary (2002).
[3] The MnSOST-R carries a possible total score of thirty-one, with a high score being the worst. Any score of eight or above denotes a 70% recidivism rate and a "possible" commitment. A score of thirteen and above carries an 88% recidivism rate and "probable" commitment. As noted, EST's score was eight, thus bringing him, albeit barely, within the 70% category. A score of seven would have denoted a 45% recidivism rate. Indeed, as noted, his score of four on the Static 99 test equated with a fifteen-year reoffense rate of 38%.
[4] In his report, Gambone concluded that E.S.T. presented a moderate to high risk "for sexual recidivism within the next ten years." He referred the matter to the Attorney General's office "for further psychiatric evaluation to determine whether inmate meets the criteria for commitment as a sexually violent predator." Interestingly, Gambone also stated that as of the time of his evaluation, E.S.T. "does not meet the criteria for the appropriateness of a civil (psychiatric) commitment or forensic psychiatric commitment (i.e., A.K.F.)." There was no comment by the testifying experts on this aspect of Gambone's report or its significance.
[5] Of course, since this is a civil proceeding, the Sixth Amendment right of confrontation is not directly applicable. Nevertheless, it is worth noting the Supreme Court's recent holding that testimonial hearsay exceptions cannot trump the Sixth Amendment's requirement for in-person confrontation. Crawford v. Washington, ___ U.S. ___, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Although technically civil, an SVPA commitment hearing, with its very real threat of lengthy incarceration, is almost pseudo-criminal in nature and should provide as much procedural protection to the committee as the circumstances permit. As the dissenters said in Commonwealth v. Given, 441 Mass. 741, 808 N.E.2d 788, 796 n. 1 (2004)(Ireland, J., dissenting), "[a]lthough the holding in the Crawford case in inapplicable here because the proceeding was civil rather than criminal, it is the Court's reasoning regarding the reliability of out-of-court statements that applies in this context...."
[6] In fact, the court did place heavy emphasis on the nature of the offenses, which involved violence and the use of a weapon.
[7] The situation might be different for an individual who was convicted after trial and continues to maintain his innocence. Whether such an individual's denial of the offense and refusal of treatment would be entitled to any weight is not before us in this case, where E.S.T. confessed to his crimes, pled guilty and admitted to the relevant facts in his plea proceeding.