# RECORD IMPOUNDED

## NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0742-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

M.L.B.,[1]

     Defendant-Appellant.

_____

Argued October 31, 2023 – Decided December 6, 2023

Before Judges Smith and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 19-12-0999.

Andrew Gimigliano argued the cause for appellant (Mandelbaum Barrett PC, attorneys; Andrew Gimigliano and Robert C. Scrivo, of counsel and on the briefs).

Tiffany M. Russo, Assistant Prosecutor, argued the cause for respondent (Robert J. Carroll, Morris County Prosecutor, attorney; Tiffany M. Russo, on the brief).

---

[1] We use initials to protect the confidentiality of the parties in these proceedings. R. 1:38-3(a)(2).

PER CURIAM

M.L.B. appeals from an October 3, 2022 amended Law Division order continuing his civil commitment at Greystone Park Psychiatric Hospital subject to Krol[2] status periodic review. We affirm.

I.

We summarize the facts and procedural history most pertinent to this appeal from the record. On August 7, 2019, a female, later determined to be L.K., called the Washington Township Police advising she had been shot twice by M.L.B. and was located at a local residence in town. Upon arrival, officers observed R.G. restraining M.L.B. and gunshot wounds to L.K.'s chest. M.L.B. was arrested and charged. L.K. and R.G. were tenants residing on M.L.B.'s property where he resided in a separate residence. The parties had prior incidents of discord, which resulted in police calls.

On April 14, 2022, a jury found M.L.B. not guilty by reason of insanity (NGRI) of attempted murder, N.J.S.A. 2C:5-1(a)(3) and N.J.S.A. 2C:11-3 (a)(1), and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4 (a)(1). M.L.B. also was found not guilty of separate charges of attempted murder and

---

[2]  State v. Krol, 68 N.J. 236 (1975).

A-0742-22

possession of a weapon for an unlawful purpose. He was transferred to the custody of the Department of Health and placed inpatient at Ann Klein Forensic Center for evaluation and treatment. M.L.B. was then scheduled for an initial Krol review pursuant to N.J.S.A. 2C:4-8(b)(3).

The Krol judge who had presided over the first hearing had conducted the trial. Two psychiatric experts, Dr. Joanna Bajgier for the State and Dr. Steven Simring for M.L.B., testified at the hearing. Both experts were qualified without objection.

Dr. Bajgier worked as a psychiatrist in the general psychiatric unit at Ann Klein along with other medical professionals including psychologist Dr. Kim Reeves. Dr. Bajgier testified in evaluating M.L.B. regarding commitment, she reviewed Dr. Reeves's records and reports, including a risk assessment. She testified that she considered Dr. Reeves's reports and incorporated the findings into her own report. Dr. Bajgier also reviewed M.L.B.'s progress charts, psychiatric medical history including prior diagnoses, and other relevant records, such as the report of M.L.B.'s trial psychiatric expert, Dr. Simring. Dr. Simring had diagnosed M.L.B. with delusional disorder and persistent depressive disorder.

A-0742-22

Dr. Bajgier met with M.L.B. on "at least a weekly basis" and characterized his inpatient hospitalization as "uneventful." Approximately three months after arriving at Ann Klein, Dr. Bajgier spent two hours and fifteen minutes meeting with M.L.B. for his evaluation. Dr. Bajgier relayed that during the meetings M.L.B.: had a "cooperative" demeanor; demonstrated anxiety "[w]hen he talked about the case"; and was "somewhat obsessive about the case." Regarding M.L.B.'s diagnoses, Dr. Bajgier relayed that she "stuck with" the diagnoses M.L.B. had "actually been treated for," which were "adjustment disorder with anxiety and post-traumatic stress disorder and major depressive disorder." When asked whether she witnessed "histrionic or narcissistic personality traits," Dr. Bajgier testified "[M.L.B.] bec[ame] very animated" and "dramatic" as that was "his personality style." She stated that upon arriving at Ann Klein, M.L.B. had stopped taking all medication at his own request.

Dr. Bajgier relayed the violence risk assessment—conducted to ascertain future violence—indicated "under relationships" there was a presence of "relevance high [which] means that it's a protective factor." Further, M.L.B. told Dr. Bajgier that he may not have shot L.K., "he [didn't] remember shooting her," he was trying to "fill in the gaps," and "it's possible that it" did not occur. Dr. Bajgier testified that there was no "active psychiatric diagnosis," and she

4

"didn't firsthand[] make any of the diagnoses." Further, "the more [she had] worked at Ann Klein, the more [she had] seen those diagnoses just [got] carried forward" and "may be inaccurate." After evaluating M.L.B., she did not change any diagnoses, because she found he did not suffer any mental disease.

Dr. Bajgier further testified that she included in her report that Ann Klein's Special Status Patient Review Committee (SSPRC) recommended M.L.B.'s continued commitment at Greystone. The committee included the Ann Klein department chairpersons of psychiatry, social work, psychology, and security. SSPRC reviewed M.L.B.'s patient's progress notes, risk assessment, and Dr. Bajgier's "treatment team" reports in consideration of a step-down in treatment. Dr. Bajgier included the information in her report to distinguish her disagreement. Dr. Bajgier determined M.L.B. "could be discharged to the community" with outpatient treatment as he "carrie[d] [a] variety of diagnoses from different times, so the outpatient provider" could manage recurring symptoms.

The Krol judge allowed the State to move into evidence, over objection, Dr. Bajgier's and Dr. Reeves's reports. Defense counsel argued, "[t]he fact that an expert might rely on something [wa]s a different question than whether it bec[ame] admissible evidence."

Dr. Simring testified he met with M.L.B. twice in preparing his "recommendation as to [M.L.B.]'s ongoing status under <u>Krol</u>." In formulating his opinion, Dr. Simring also reviewed and relied on Dr. Bajgier's and Dr. Reeves's reports, new and old medical records, and the progress notes. Dr. Simring conversed with M.L.B.'s "original therapist" and "other individuals who had treated him." Dr. Simring recommended a "day hospital or partial hospital" for M.L.B.'s "ongoing psychiatric treatment for . . . his long history of depression" and the "great trauma" he had been through. He provided, the "bottom line [wa]s he need[ed] a great deal of psychiatric therapy, not because he's 'mentally ill' in terms of insane, but because he ha[d] a lot of life problems that he need[ed] help with that unfortunately he [was] not getting." Dr. Simring recommended "therapy five days a week," for approximately seven hours a day.

When confronted on cross-examination regarding his recommendation from August 2020 of inpatient treatment at Greystone, which was antithetical to his current recommendation of release, Dr. Simring acknowledged that M.L.B. would be confronting significant stressors—specifically, the civil lawsuit filed by L.K. and the "re-establish[ment] of his career in the equestrian community." Dr. Simring explained his prior recommendation for Greystone was "not a final

A-0742-22

recommendation" and he had since determined M.L.B.'s "greatest need [wa]s intensive psychotherapy" with treatment in a facility for six-to-eight hours a day.

Dr. Simring acknowledged he had diagnosed M.L.B. with delusional disorder. In response to the judge's inquiry regarding whether the diagnosis was current, the doctor responded, it "[wa]s a chronic psychiatric condition that never completely [went] away entirely and at best, delusional disorder [wa]s kept under control so that it d[id] not rear its ugly head." Additionally, he added that M.L.B. "still, at some level believe[d] that [L.K.] presented a real threat to him . . . [t]here [wa]s no medication that really help[ed] with delusional disorder, except in the very acute phases of it." Dr. Simring disagreed with "Dr. Bajgier's position" that M.L.B. was "not suffering from anything," and concluded M.L.B. "ha[d] a long-term chronic depressive disorder" that may require medication and would "certainly [require] psychotherapy to get his life back together." Defense counsel moved Dr. Simring's report into evidence without objection.

In his oral decision, the judge credited Dr. Simring's testimony regarding M.L.B.'s diagnoses over Dr. Bajgier's lack of diagnoses, finding M.L.B. suffered from depression and delusional disorder. The judge reasoned Dr. Simring's experience and greater knowledge about M.L.B.'s psychiatric history lent to his credibility. The judge credited Dr. Simring's opinion that delusional disorder

7

was a chronic condition and found it relevant that he recommended therapy five full days a week. The judge found M.L.B. "continue[d] to suffer from delusional disorder." Additionally, the judge found it highly relevant that M.L.B. "still believe[d] he was justified in his actions in shooting" L.K. and believed "he was acting in self-defense," which demonstrated he "lack[ed] insight into his condition." In determining that M.L.B. was a danger to L.K. and to others, the judge noted the uncontroverted stressor of L.K.'s pending civil lawsuit and found it was unknown what M.L.B. was "capable of dealing with."

Lastly, the judge found Ann Klein was not appropriate for M.L.B.'s treatment, ordering a transfer to Greystone for a more appropriate level of care. The judge found Greystone provided the opportunity to be "moved from Level 1 . . . to Level 3," through less restrictive programs as his treatment progressed. The judge advised M.L.B. that his progress would be addressed at the next hearing and ordered that his treating physicians could approve a step-down unit transfer within the facility without further appearance. The judge noted the victim and her father had sent letters to the court, but the information was not included in his decision.

M.L.B. raises the following arguments for our consideration: the State failed to carry its burden of proving M.L.B. had a mental illness; the State did

8

not establish that M.L.B. was a danger to himself, property, or others because both experts testified he was not a danger; less restrictive treatment alternatives were appropriate; and the judge improperly relied on hearsay evidence without providing M.L.B. the opportunity to cross-examine.

## II.

We are guided by well-settled principles of law which govern a Krol hearing review of an NGRI commitment.  A judge's determination is "subject to modification on appeal only where the record reveals a clear abuse of discretion."  In re Civ. Commitment of J.M.B., 395 N.J. Super. 69, 90 (App. Div. 2007), aff'd, 197 N.J. 563 (2009).  It is recognized that judges who hear commitment cases "generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'"  In re Civ. Commitment of R.F., 217 N.J. 152, 174 (2014) (quoting In re Civ. Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)).  To the extent the questions presented are procedural or legal ones, however, our review is de novo.  In re Commitment of J.L.J., 196 N.J. Super. 34, 49 (App. Div. 1984).

Appellate review of a Krol order is "extremely narrow, with the utmost deference accorded the reviewing judge's determination as to the appropriate accommodation of the competing interests of individual liberty and societal

safety in the particular case." State v. Fields, 77 N.J. 282, 311 (1978). Our Supreme Court has held, "Such sensitive decisions will be subject to appellate modification only where the record reveals a clear mistake in the exercise of the reviewing judge's broad discretion in evaluating the committee's present condition and formulating a suitable order." Ibid. "Accordingly, it is our responsibility to canvass the record inclusive of the expert testimony to determine whether the findings made by the trial judge were clearly erroneous." J.M.B., 395 N.J. Super. at 89 (citing In re D.C., 146 N.J. 31, 58-59 (1996)).

"We give deference to the findings of our trial judges because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" R.F., 217 N.J. at 174 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "So long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed." Id. at 175 (quoting Johnson, 42 N.J. at 162). We review expert testimony in the record for credible evidence to support the judge's fact-findings before determining those findings were clearly erroneous. See D.C., 146 N.J. at 58-59.

When an accused is found NGRI, the criminal proceedings terminate "unless the accused remains mentally ill and in need of involuntary

10

commitment." In re Commitment of W.K., 159 N.J. 1, 4 (1999). Following an NGRI verdict, "the accused can be involuntarily committed," and thereafter, the court must conduct "periodic review hearings," known as Krol hearings, "to determine if continued involuntary commitment is warranted." Ibid.

Defendants "may be held in continued confinement if the person is a danger to self or others and is in need of medical treatment." Id. at 2. The purpose is not to punish, but "to protect society against individuals who, through no culpable fault of their own, pose a threat to public safety." Krol, 68 N.J. at 246. After commitment, NGRI defendants "are reviewed on a periodic basis under the same standards as those applied to civil commitments generally." In re Commitment of M.M., 377 N.J. Super. 71, 76 (App. Div. 2005), aff'd, 186 N.J. 430 (2006) (citing Krol, 68 N.J. at 251). An NGRI defendant "may remain under Krol commitment for the maximum ordinary aggregate terms that defendant would have received if convicted of the offenses charged, taking into account the usual principles of sentencing." W.K., 159 N.J. at 6.

To continue involuntary commitment, the State must establish a defendant poses "a substantial risk of dangerous conduct within the reasonably foreseeable future." M.M., 377 N.J. Super. at 76 (quoting Krol, 68 N.J. at 260). The focus is on whether the defendant "presently poses a significant threat of harm, either

to himself or to others." Ibid. (quoting Krol, 68 N.J. at 247). The determination of "dangerousness" is "a legal one, not a medical one." Krol, 68 N.J. at 261. An "[e]valuation of the magnitude of the risk involves consideration both of the likelihood of dangerous conduct and the seriousness of the harm which may ensue if such conduct takes place." Id. at 260 (citing Cross v. Harris, 418 F.2d 1095, 1100-01 (1969)).

N.J.S.A. 30:4-27.2(h) defines danger to self as: "by reason of mental illness the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate . . . that it is probable that substantial bodily injury, serious physical harm, or death will result within the reasonably foreseeable future." A danger to others is defined as: "by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future." N.J.S.A. 30:4-27.2(i). The required review for a "[d]etermination of dangerousness involves prediction of defendant's future conduct rather than mere characterization of . . . past conduct." Krol, 68 N.J. at 260-61. Yet, a "defendant's past conduct is important evidence as to his probable future conduct." Id. at 261. As the statute directs, the dangerousness determination "shall take into account a person's history, recent behavior, and

any recent act, threat, or serious psychiatric deterioration." N.J.S.A. 30:4-27.2(h), (i).

The determination requires a "delicate balancing of society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy." Krol, 68 N.J. at 261. In ordering restraints to reduce the risks an NGRI defendant poses, any "[d]oubts must be resolved in favor of protecting the public, but the court should not, by its order, infringe upon defendant's liberty or autonomy any more than appears reasonably necessary to accomplish this goal." State v. Ortiz, 193 N.J. 278, 292 (2008) (quoting Krol, 68 N.J. at 261).

### III.

We conclude the judge's finding that M.L.B. has a mental illness as he suffers from depression and delusional disorder, is supported by sufficient credible evidence in the record. The judge accepted Dr. Simring's testimony regarding M.L.B.'s mental illness diagnoses and noted the expert's detailed knowledge of M.L.B.'s medical history. While rejecting the experts' opinions that M.L.B. should be released from inpatient care, the judge found relevant that Dr. Simring testified M.L.B. needed "therapy five days a week" at a facility for approximately seven hours per day. The judge accepted Dr. Simring's testimony

that M.L.B. needed continued treatment and possible medication. Additionally, as noted by the judge, Dr. Bajgier testified she witnessed M.L.B. demonstrate anxiety and observed him to be "somewhat obsessive." M.L.B.'s argument that the State failed to establish he has a present mental illness is without merit. See State in the Int. of M.P., 476 N.J. Super. 242, 289 (App. Div. 2023) (finding "the trier of fact is free to accept some portions of an expert's opinion and reject others" (citing Sipko v. Koger, Inc., 251 N.J. 162, 188 (2022))).

The judge reasoned the experts' testimony that M.L.B. still believed "he was justified in shooting" L.K because it was in self-defense demonstrated impaired judgment. A "mental illness" under Rule 4:74-7(f)(1)(2), as defined by N.J.S.A. 30:4-27.2(r), is "a current, substantial disturbance of thought, mood, perception, or orientation which significantly impairs judgment, capacity to control behavior, or capacity to recognize reality." The judge found M.L.B.'s mental illness impaired both his judgment and capacity to have "insight into his condition." This finding is supported by substantial credible evidence in the record.

Nor are we persuaded by M.L.B.'s assertion that the State failed to prove he was a danger. The judge determined M.L.B. was a danger to the community and, more specifically, to L.K. Again, the judge relied on Dr. Simring's

testimony that M.L.B. at "some level believe[d] that [L.K.] presented a real threat to him" and his actions in shooting her were in self-defense. Noting the uncontroverted stressors M.L.B. would be confronting with the civil lawsuit brought by L.K., which likely would require some level of interaction between the parties, the judge found M.L.B. was a risk to L.K. The judge determined M.L.B.'s delusional disorder could not be sufficiently addressed to prevent the attendant risks from his inability to cope with stressors. We conclude the judge's finding that M.L.B. presented a substantial danger for the foreseeable future is sufficiently supported by credible evidence in the record.

We observe the judge also considered the possibility of less restrictive treatment in deciding to transfer M.L.B. to Greystone and entering a self-initiating order permitting M.L.B.'s transfer to a step-down unit if medically appropriate. The order provided: "[t]he treatment team at Greystone . . . [wa]s allowed to change the privileges of [M.L.B.] between Level I – III . . . without prior leave of this [c]ourt." Contrary to M.L.B.'s argument, the judge correctly considered the less restrictive treatment alternatives but found, based on sufficient evidence, that the State had proven the necessity for continued commitment.

15

"The State is, as a general matter, entitled to call experts on the subject of commitment and, to the extent the information the experts relied upon is of a type reasonably relied upon by experts in that field, the State can prove the grounds for commitment without calling as a witness each person who provided information upon which the expert relied." In re Civ. Commitment of A.Y., 458 N.J. Super. 147, 166 (App. Div. 2019); N.J.R.E. 703. The "[p]rior expert opinions [relied upon] are admissible, not as substantive evidence, but as a basis for the expert's opinion." A.Y., 458 N.J. Super. at 167 (citing In re Commitment of E.S.T., 371 N.J. Super. 562, 576 (App. Div. 2004)).

In his findings, the judge primarily relied on M.L.B.'s expert's credible testimony. The judge reasoned Dr. Simring's testimony concerning M.L.B.'s diagnoses was credible because the doctor had the greatest familiarity with M.L.B.'s full medical history, which he relied upon in formulating his opinions. Notably, Dr. Simring provided that in reaching his opinions, he relied on uncontested diagnoses, medical charts, reports, and psychiatric information relayed through conversations with other professionals. Relevantly, Dr. Simring's opinion and medical history testimony were introduced by M.L.B. and were uncontested. See In re Civ. Commitment of A.E.F., 377 N.J. Super. 473, 492 (2005) (holding expert witnesses are not precluded from relying "in part[]

on prior evaluations conducted for other purposes . . . and other psychiatric evaluations conducted . . . as long as the opinion ultimately rendered . . . is that of the witness based on his or her own evaluation"). We note Dr. Simring's report was admitted without objection. M.L.B.'s argument that reversal and release from commitment is warranted because the judge "improperly relied on hearsay without the opportunity for cross-examination" is unavailing.

Dr. Simring testified to the information he extracted from Dr. Bajgier's and Dr. Reeves's reports, as well as from M.L.B.'s other previous therapists. Dr. Simring relayed he reviewed M.L.B.'s medical history in the normal course of conducting his evaluation and recommendation. Because the judge based his findings almost exclusively on Dr. Simring's testimony, any reference to the SSPRC recommendations outside of the background information upon which both experts reasonably relied to distinguish their opinions, was harmless. See In re Commitment of E.S.T., 371 N.J. Super. 562, 576 (App. Div. 2004) (finding that while it is improper for a judge to consider "for their truth[,] any complex diagnoses that may have been contained" in expert reports, "the admission of the records [was] harmless under the circumstances" (quoting In re Commitment of A.X.D., 370 N.J. Super. 198, 202-03 (App. Div. 2004))).

Although we agree with defendant's argument that the blanket admission of Dr. Bajgier's and Dr. Reeves's expert reports was improperly granted, we recognize the judge delivered his opinion immediately at the conclusion of the one-day hearing. While a judge may consider background information deemed trustworthy in evaluating an expert's opinion testimony, the better course is for a judge to make a "clearer [evidence ruling] by acknowledging the applicability of N.J.R.E. 808." A.X.D., 370 N.J. Super. at 202-03; see R. 2:10-2 (noting that a trial error or omission may be disregarded "unless it is of such a nature as to have been clearly capable of producing an unjust result").

It is recognized psychiatric evaluations and "hospital reports often indicate that the author has recorded his or her observations of the patient's relevant behavior in the course of performing his or her duties. Such reports are admissible." M.M., 384 N.J. Super. at 334 (citing N.J.R.E. 803(c)(6)). Additionally, "[t]o the extent that such reports include statements made by the patient for purposes of treatment or in explaining his or her present state of mind, they are also admissible for the truth of those statements." Ibid. (citing N.J.R.E. 803(c)(3), (4); N.J.R.E. 805). With these considerations, we discern no basis to disturb the judgment of commitment, which is amply supported by the sufficient evidence.

A-0742-22

Lastly, M.L.B. argues the judge wrongfully set the next <u>Krol</u> hearing date for "six months after the initial hearing, despite <u>Rule</u> 4:74-7(f)(2) requiring the second hearing to be held three months after the initial hearing." Defense counsel objected to the ordered March 2023 date and requested compliance with the <u>Rule</u>. While we recognize the date has passed, M.L.B. is correct that the hearing should have been scheduled within three months. M.L.B. has an absolute right to have timely <u>Krol</u> status reviews. <u>Rule</u> 4:74-7(f)(2) provides for "inpatient treatment, periodic reviews should be no later than (i) three months from the date of the first hearing, and (ii) nine months from the date of the first hearing, and (iii) [twelve] months from the date of the first hearing, and (iv) at least annually thereafter." Accordingly, future <u>Krol</u> hearings shall be scheduled in compliance with the <u>Rule</u>.

To the extent we have not addressed M.L.B.'s remaining arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0742-22