873 A.2d 604 (2005)
377 N.J. Super. 473
In re CIVIL COMMITMENT OF A.E.F.  SVP306-03.
Superior Court of New Jersey, Appellate Division.
Submitted February 7, 2005.
Decided May 16, 2005.
*605 Yvonne Smith Segars, Public Defender, attorney for appellant (Alison Perrone, Designated Counsel, of counsel and on the brief).
Peter C. Harvey, Attorney General, attorney for respondent (Patrick DeAlmeida, Assistant Attorney General, of counsel; Zoé J. McLaughlin and Mary Beth Wood, Deputy Attorneys General, on the brief).
Before Judges A.A. RODRIGUEZ, CUFF and WEISSBARD.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
A.E.F. appeals from a June 19, 2003 order finding that he is a sexually violent predator in need of involuntary civil commitment and ordering that he be committed to the Special Treatment Unit (STU), pursuant to the Sexually Violent Predator *606 Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. This appeal requires us to further refine the standards for the use of hearsay in SVPA Commitment hearings which we addressed in In re Commitment of E.S.T., 371 N.J.Super. 562, 854 A.2d 936 (App.Div. 2004). Having done so, we affirm A.E.F.'s commitment.
In support of his appeal, A.E.F. presents the following arguments for our consideration:
POINT ONE
THE COURT ERRED IN RELYING ON THE OPINIONS OF DRS. ZEIGUER AND BARONE BECAUSE THESE OPINIONS WERE BASED IN PART ON THE OPINIONS OF NON-TESTIFYING EXPERTS. (Not Raised Below).
POINT TWO
THE EVALUATIONS PREPARED BY NON-TESTIFYING EXPERTS CONSTITUTE HEARSAY, DO NOT COMPLY WITH N.J.R.E. 703, AND SHOULD NOT HAVE BEEN ADMITTED AS EXHIBITS AT TRIAL.
POINT THREE
THE COURT ERRED IN BASING ITS DECISION IN PART UPON ALLEGATIONS RELATED TO A.E.F.'S CRIMINAL CONDUCT THAT WERE NEVER ADMITTED BY A.E.F. (Not Raised Below).
POINT FOUR
THE STATE FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT A.E.F. WAS SUBJECT TO SVP COMMITMENT.
A resolution of these issues requires a detailed statement of the factual and procedural history leading to the order under review.
We begin with A.E.F.'s criminal history, as it relates to offenses that are alleged to be sexually related.[1] On July 11, 1972, when he was twenty-two years old, A.E.F. pled guilty to making obscene phone calls to an ex-girlfriend and was sentenced to thirty days in jail, a fine, and one year probation. On August 17, 1973, a sixteen-year-old girl claimed that she had been raped by A.E.F. In a statement given to the police, A.E.F. stated that the sexual encounter was consensual. Upon further investigation, police came to question the veracity of the victim's account. In addition, the victim became uncooperative. As a result, the rape charge was never pressed. Rather, on January 25, 1974, A.E.F. pled guilty to contributing to the delinquency of a minor and was sentenced to a suspended indeterminate term at the Youth Correction facility, a fine and two years probation.[2]
On November 4, 1974, A.E.F. was arrested for contributing to the delinquency of a minor resulting from a report by a seventeen-year-old girl that he had attempted to sexually assault her after they, along with another male friend, had watched a pornographic movie. The friend claimed that he had to fire a shotgun to dissuade A.E.F. from the assault. A.E.F. denied any assaultive behavior and provided a full statement to the police in which he described an entirely voluntary encounter. On April 7, 1976, A.E.F. *607 pled guilty to the delinquency charge and imposition of sentence was suspended.
On June 9, 1979, A.E.F. was arrested for having abducted and sexually assaulted a woman at gunpoint. Despite contending that he was innocent, on September 27, 1979, A.E.F. pled guilty to assault with intent to commit rape while armed and, on April 20, 1980, was sentenced to four to seven years in State Prison. He was paroled on April 21, 1981. One week after his parole, on April 28, 1981, A.E.F., then thirty-one years old, allegedly entered the home of a fifty-one-year old woman and assaulted her with a screwdriver while she was in her bed. The woman claimed that A.E.F. moved the weapon around her body, "moaning" as if he were engaged in sexual intercourse. The victim managed to escape and A.E.F. was not arrested until September 8, 1981. In the interim, A.E.F. was again arrested, on August 4, 1981. He allegedly broke into the home of a thirty-one-year old woman, threatened her with a knife, tied her up with electrical tape, and forced her to masturbate him. A.E.F. was indicted on multiple charges arising from this incident but eventually, after his trial and conviction for the April 1981 offenses, the charges were dismissed due to the victim's unwillingness to proceed.
A.E.F. denied that he committed the April 1981 offense, but was convicted by a jury and on March 26, 1982, was sentenced to seven years for burglary and a consecutive four-year term for aggravated assault, with five and one-half years of parole ineligibility. A.E.F. was confined at Leesburg State Prison. While there, he apparently made significant progress in psychotherapy according to a report by the Director of Professional Services at Leesburg. As a result, on October 28, 1986, the trial judge granted his motion for a change of custodial sentence to permit his entry into a residential drug abuse rehabilitation program run by the Veterans Administration (V.A.). See R. 3:21-10(b)(1). On November 10, 1986, A.E.F.'s sentence was modified to five years probation conditioned on entry into the V.A. program.
Finally, on February 26, 1988, about sixteen months after his commitment to the V.A. program, A.E.F. assaulted a fifteen-year-old girl and her seventeen-year-old brother after entering their house, pretending that he was collecting money for newspaper delivery. The boy then fled to a neighbor's home, after A.E.F. hit him in the head. He then assaulted the girl, pulling her pants down and ripping her brassiere while attempting to touch her breasts. The girl struck A.E.F. with a phone and he managed to flee the house, eluding the brother who, along with a neighbor, had returned to rescue his sister. A.E.F. was arrested on February 29, 1988. On November 2, 1989, A.E.F. was convicted by a jury of burglary, aggravated criminal sexual contact, aggravated sexual assault, criminal sexual contact, and resisting arrest. On July 27, 1990, he was sentenced to an aggregate term of twenty-one and one-half years in prison with five years parole ineligibility. Because A.E.F. had been on probation when he committed the February 26, 1988 offense, he was sentenced on April 19, 1991 for violation of probation to eleven years with five and one-half years parole ineligibility, the same term originally imposed for the April 28, 1981 offenses. That term was ordered to be consecutive to the July 27, 1990 sentence. A.E.F. appealed and we affirmed his conviction on March 23, 1993, but remanded for an award of appropriate gap time.
On March 7, 2003, shortly before A.E.F. was to "max out" on his sentence, the State filed a petition for involuntary commitment under the SVPA. The petition was supported by clinical certificates of *608 Donald R. Reeves, Jr., M.D. and Vasudev N. Makhija, M.D., both psychiatrists employed by Central Medical Services (CMS), the healthcare entity that provides medical services to State Prison inmates.
Dr. Reeves interviewed A.E.F. at Midstate Correctional Facility for one hour on March 7, 2003, the same day he completed the certificate. He also reviewed the following: risk assessments of January 23, 2003 and February 4, 2002; psychological evaluations of August 31, 2002 and October 5, 2002; correspondence of February 19, 2003; evaluations of May 3, 1990 and November 20, 1998 from the Adult Diagnostic and Treatment Center (ADTC); a letter from the Prosecutor's office dated January 21, 2003; A.E.F.'s prison classification file, which included the items listed above as well as a criminal history. With respect to psychological testing or risk assessment tools, Dr. Reeves noted that A.E.F. had scored eight on the Static-99[3], a score associated with a 39%, 45% and 52% probability of sexual reoffense within five, ten, or fifteen years, respectively, a score of fifteen on a psychopathy checklist screening version conducted at ADTC in 1998, and house-tree-person drawings that "show inadequacy and discomfort [with][A.E.F.'s] sexuality." Reviewing A.E.F.'s sexual history, Dr. Reeves noted that he either denied any sexual intent or behavior in his crimes or "minimizes its severity." Concerning his criminal history, Dr. Reeves stated that A.E.F. had "been convicted of crimes involving forced sex or attempts at forced sex on five separate occasions from 1973-1988." A.E.F. had received no extended sex-offender specific therapy while in prison, specifically having been offered none at ADTC.
Dr. Reeves' diagnoses were: (1) polysubstance dependence; (2) personality disorder NOS [not otherwise specified] (with prominent antisocial traits beginning after age fifteen); (3) Hepatitis B carrier; chronic hepatitis C. His conclusion was that "[A.E.F.]'s Personality Disorder and Polysubstance Dependence, individually and together, result in A.E.F. having serious difficulty controlling his sexual behavior, such that it is likely he will not control his sexual behavior and will reoffend." As a result, A.E.F. qualified for SVPA commitment.
Dr. Makhija interviewed A.E.F. for one hour and twenty minutes immediately following the interview with Dr. Reeves. Dr. Makhija reviewed A.E.F.'s medical and classification records including the ADTC psychological evaluations by Dr. Catherine Blandford on May 3, 1990, and by Kenneth McNiel, Ph.D. on November 20, 1998, and the January 21, 2003 letter from the Prosecutor. A.E.F. denied receiving any in-patient or out-patient psychiatric treatment, including sex-offender specific therapy, other than several visits with Dr. Streete, a psychiatrist at Midstate Correctional Facility. Dr. Makhija also noted A.E.F.'s score of eight on the Static-99 test, placing him in the high risk category, as well as a score of sixteen on the MnSOST-R,[4] also placing him in the high risk range. Both tests were completed that same day, March 7, 2003. Dr. Makhija diagnosed the following: (1) alcohol *609 abuse, (2) polysubstance abuse, (3) Impulse Control Disorder, NOS, and (4) antisocial personality disorder. Without any additional comment or discussion, the doctor found A.E.F. subject to SVPA commitment, simply placing a check mark next to the appropriate preprinted language on the certificate which states that "[t]his person suffers from a mental abnormality (as defined by the Act) or personality disorder that makes the person likely to engage in acts of sexual violence if not confined to a secure facility for control, care and treatment."
Based on the petition and accompanying certificates, A.E.F. was temporarily committed to the STU on March 17, 2003. A final commitment hearing was held on June 19, 2003, at which the State presented the testimony of two experts, Luis Zeiguer, M.D., and Natalie Barone, Psy.D.
Dr. Zeiguer interviewed A.E.F. twice, on June 16 and June 17, 2003, the first time for seventy to eighty minutes and the second time for twenty minutes. In addition to various official reports containing information about A.E.F.'s offenses, Dr. Zeiguer reviewed the following:
1) The Certificate for SVPA Commitment by Dr. Reeves,
2) The Certificate for SVPA Civil Commitment by Dr. Makhija,
3) Psychological Evaluation by K. Vaughan, Psy.D. dated 8/31/02,
4) Psychological Evaluation by K. Vaughan, Psy.D. dated 10/5/02,
5) ADTC Psychological Evaluation by Dr. McNiel dated 11/20/98,
6) Psychological Evaluation by Dr. Philip Slonim, Ph.D. dated 10/6/00,
7) ADTC Psychological Evaluation by Dr. Blandford dated 5/90,
8) ADTC Psychiatric Evaluation by Dr. Charles Gnassi dated 10/25/79.
Significantly, in his interviews with Dr. Zeiguer, A.E.F. denied "that there was any sexual intent or sexual arousal behind any of [his] offenses." A.E.F. told Dr. Zeiguer that "he never committed a sexual offense" and that he did not need sex offender treatment. Dr. Zeiguer's opinion was that A.E.F.
suffers paraphilia non-consent as indicated by a persistent pattern of repetitive behavior in which he engages in sex with a non-consensual partner. He does not learn from experience. He's not able to stop this behavior. Even days being released from prison, he's willing to risk the freedom on the only person we know for sure he cares about, which is himself.
And his major offenses, I think they were all sexual, although he's a versatile offender who did bad checks, distribution of drugs. Really, the big, big times were all for sexual offenses. And then he shows a personality which is extremely impulsive, tends to disregard the truth, tends to underestimate whoever he's dealing with. He's grandiose. He's not aware it took place realistically what he's  who is he dealing with.
. . . .
[A.E.F.] perceives females just as prey, objects that he can use sexually. He has  he has some awareness of the way they feel so that he can fake sympathy and establish a semblance of friendship with the victims. This appears to be part of his multo-grande to get their compliance and minimize their resistance. But he has not [sic] empathy. And the pattern of offenses shows that his primary drive appears to be sex, as opposed to drives  as he says, major offense are sexual offense, they are not drug offenses.
The doctor's diagnosis of multi-substance dependence was a significant factor *610 in assessing the risk of sexual reoffense in that "under the influence of drugs, he could become more disinhibited and more grandiose, and he could underestimate even further the risk of being caught. So, the drugs would embolden him and would allow him to offend with more carelessness and less planning."
Dr. Zeiguer's conclusion was that A.E.F. has serious difficulty controlling his sexual behavior, resulting in a "very substantial" risk "that he would re-offend in a manner similar to previous offenses if released."
Dr. Barone, a forensic psychologist, interviewed A.E.F. for one hour and fifteen minutes six days before her testimony. Essentially, Dr. Barone reviewed the same material as Dr. Zeiguer. Dr. Barone opined that A.E.F. has a "deviant arousal pattern" and that most of his offenses were "either blatantly sexual or sexually motivated." The length of A.E.F.'s offense history demonstrates that "he does not learn from previous behavior because he doesn't care." "[H]e lacks remorse, he lacks empathy for what he's done. Although he does attempt to present as though he's remorseful. My opinion is it's quite superficial." Dr. Barone found A.E.F. to pose a significant risk of sexual reoffense unless confined, explaining that,
when you take this anti-social personality disorder, which is quite severe and clearly overlaps with certain psychopathic traits, and you combine it with the fact that he has had no sex offender treatment, he has a level of sexual pathology that warrants a diagnosis of paraphilia, he has a remarkable substance abuse history, and his actuarial score is as high as it could possibly be on the Static. In my mind, the combination of all of these factors 
THE COURT: I thought the highest was 12.
DR. BARONE: Well, there are  it doesn't change the risk. It's still a high risk category. And that level of risk is the same whether he got a 6 or an 11.
As with Dr. Zeiguer, A.E.F. denied to Dr. Barone that there was any sexual motive or intent in any of his crimes. Rather, he claimed that his only motive "was to try to get money for drugs."
Judge Freedman accepted the opinions of the two experts, which he concluded were "basically uncontradicted." He found A.E.F. to be "an impulsive, manipulative, aggressive and highly sexualized chronic substance abuser. And it is the confluence of these elements that lay the foundation for his inappropriate sexual behavior." A.E.F. "without question, suffers from a mental abnormality in the form of a paraphilia, and probably an impulse-control disorder, and a personality disorder." See E.S.T., supra, 371 N.J.Super. at 566 n. 2, 854 A.2d 936. The judge concluded that A.E.F. is
predisposed without any question at all, beyond any doubt, to engage in acts of sexual violence. And he has a very substantial inability to control his behavior and is more highly likely if he were to be let out on the street today to commit another offense of this kind, well within the reasonably foreseeable future  probably within months  particularly if he went back to drugs and alcohol, which is almost certainly he would do.
So, for all those reasons, I don't think there's any question that [A.E.F.] comes within the purview of the statute. I will therefore commit him and set a review date of one year.
A.E.F. argues that his commitment was based to an unacceptable extent upon hearsay in that the opinions of Drs. Zeiguer and Barone were predicated on evaluations by other experts who were not called as witnesses. As part of this argument, he *611 contends that the evaluations by the nontestifying experts did not qualify for admission under N.J.R.E. 703. In support of these claims, A.E.F. relies on our decision in E.S.T. Although this case presents some elements that were present in E.S.T., we conclude that it is distinguishable in its most significant aspects.
In E.S.T., the committee committed three sexual offenses, as well as two robberies, in a limited period between May 26 and July 28, 1985. Pursuant to a plea bargain, he was sentenced to thirty years in prison with fifteen years of parole ineligibility. Id. at 564-65, 854 A.2d 936. Notwithstanding the sexual nature of the offenses, E.S.T. was never evaluated at the ADTC pursuant to N.J.S.A. 2C:47-1 to -8. As a result, he never received any sex offender treatment. Id. at 565, 854 A.2d 936. After serving about seventeen years in prison, the State petitioned for SVPA commitment. The SVPA petition was supported by clinical certificates of Dr. Herbert Koldany and Dr. Benjamin Libertore, both of whom diagnosed paraphilia NOS non-consenting, as well as polysubstance abuse and personality disorder NOS. Id. at 566-67, 854 A.2d 936. At the commitment hearing, the State presented Dr. Pogas Voskanian, a psychiatrist, and Dr. Robert Carlson, a psychologist. We noted that Dr. Voskanian had placed his primary reliance on the forensic evaluation by Drs. Kaldany and Libertore, as reflected in their certificates. Id. at 567-70, 854 A.2d 936. Dr. Carlson relied heavily on two actuarial instruments, the MnSOST-R and the Static-99, which had been administered to E.S.T. by a state employed psychologist, Dr. Gambone, about five months before the SVPA petition was filed, apparently as part of an evaluation as to whether the petition should be filed. Id. at 569, 854 A.2d 936.
We reversed the commitment order, concluding that the testifying experts, who had conducted forensic evaluations, relied too heavily on the prior evaluations of Drs. Kaldany, Libertore, and Gambone, which were themselves forensic evaluations. Id. at 571-75, 854 A.2d 936. All of the evaluators had interviewed E.S.T. only briefly and none had treated him; indeed, as we have noted, E.S.T. never received sex offender treatment during his lengthy incarceration. We questioned whether the opinions of Kaldany, Libertore, and Gambone were the type of opinions that qualified for the bootstrap admissibility sanctioned by N.J.R.E. 703, id. at 571-73, 854 A.2d 936, and concluded as follows:
As a matter of fundamental fairness, we conclude that the State should be required to produce at the initial SVPA commitment hearing the physicians who signed the clinical certificates supporting the commitment petition, if they are available and if any expert testifying in court intends to rely on the opinions contained in those certificates in rendering an opinion that the individual is subject to commitment under the SVPA.
[Id. at 575, 854 A.2d 936.]
Here, although the commitment hearing took place before E.S.T. was decided, and the decision was therefore unavailable for guidance, the critical features which rendered the commitment process in E.S.T. fundamentally unfair were absent or present to a much lesser degree. A review of the testimony and reports of Drs. Zeiguer and Barone reveals that they did not rely to any significant degree, and perhaps not at all, on the clinical certificates of Drs. Reeves and Makhija, but offered their own opinions based on a detailed examination of A.E.F.'s criminal history and prior mental health evaluations, as well as their brief interviews with him.
*612 It is true that both witnesses took into account prior forensic evaluations of A.E.F. conducted in connection with his criminal convictions. Thus, an October 25, 1979 examination by Dr. Gnassi at the ADTC, conducted in connection with A.E.F.'s 1979 plea, concluded that his history "may reflect an impulsive personality disorder associated at times with drug intake." A.E.F. did not, however, "show evidence of sexually compulsive repetitive acting out." As a result, "[t]here was no elicitation of a compulsive type of psychosexual pathology and thus this individual would not fall under the purview of the New Jersey Sex Offender Act."
A.E.F. was again subjected to an examination at the ADTC on May 3, 1990, after his jury conviction in November 1989. Once again, he was found to fall outside the Sex Offender Act due to "the absence of a finding of compulsive sexual pathology." Dr. Blandford, a psychologist, wrote as follows:
Based upon the information elicited in the present examination, it was apparent that [A.E.F.] is an exploitative individual who meets the criteria for a diagnosis of antisocial personality disorder. His history suggests his willingness to use any means, violent or sexual in order to obtain some desired goal. It appears that his sexual misconduct in the instant offense is part of a larger pattern of hedonistic, exploitative and antisocial components to his personality. Furthermore, in the absence of a well documented pattern of deviant sexual arousal pattern the examiner must conclude that [A.E.F.'s] abusive consumption of illegal drugs on the day of the instant offense was a major contributing factor to the occurrence of the crime.
It is not without significance that Dr. Blandford highly recommended "[i]ntensive psychotherapy and drug rehabilitation." As we have noted, there is no record of A.E.F. receiving such "intensive psychotherapy" during his long imprisonment.[5]
A.E.F. was examined for a third time at the ADTC on November 20, 1998, "pursuant to a pending parole decision." Dr. McNeil, a psychologist, administered a number of tests which revealed: (1) average to high average intellectual functioning, (2) prominent antisocial tendencies and violence potential, (3) antisocial tendencies but not sufficient to classify him as having a psychopathic personality disorder, (4) poor self-esteem and inadequacy and discomfort with sexuality, (5) no indications of paraphilic symptoms or other sexual problems, and (6) "none of the cognitive distortions frequently associated with untreated sexual offenders." Dr. McNeil concluded as follows:
Based on the results of this evaluation, [A.E.F.] presents at this time as an intelligent, motivated recovering drug addict, with a chronic history of severe substance abuse and antisocial criminal behaviors. He appears to be clinically stable at the present time and sincerely motivated to maintain his sobriety, though given his history, he remains at significant risk for substance abuse.
Regarding risk assessment, [A.E.F.]'s recidivism risk would appear to rest primarily on substance abuse. If he remains in recovery and actively working in NA, than his overall risk for criminal *613 involvement would be average in comparison to other parolees. Should he begin to use drugs again, however, his criminal risk would be extremely high. Overall recidivism risk would thus appear to fall in the moderate-high range, though as noted above, [A.E.F.] is clinically stable at the present time.
Should he be considered for parole release, it is strongly recommended that [A.E.F.] be required to remain active in a substance abuse program as a condition of any parole release, and that he be regularly monitored for substance abuse and association with known criminals.
A.E.F. was evaluated by Dr. Slonim on October 6, 2000, again in connection with his eligibility for parole. Dr. Slonim concluded that A.E.F. did "not appear particularly impulsive," and found "no indication of severe or behavioral problems." Dr. Slonim also concluded that A.E.F.'s antisocial activity was "associated with his substance abuse" and that he "appears able to take others in account in thoughts and behavior." Dr. Slomin recommended that A.E.F. receive treatment at the Veterans Administration "to help resolve post-traumatic stress syndrome associated with his service in Vietnam."
Dr. Vaughn, another psychologist, evaluated A.E.F. on August 31 and October 5, 2002. He concluded that A.E.F.'s risk of reoffense was related to his drug addiction. If his addiction remained in remission, his risk of reoffense was low, but if he returned to drug use, it was considered "likely that he will [re]offend."
Finally, on January 23, 2003, Desmond Streete, Ph.D., conducted a risk assessment on A.E.F. The MnSOST-R score was twelve and the Static-99 score was nine, placing A.E.F. in the high risk range. Based on those scores and the history of sexual offenses, Dr. Streete recommended A.E.F. for review for civil commitment. Dr. Streete had originally assessed A.E.F. on February 24, 2002, but did not have a full criminal history, resulting in an erroneous MnSOST-R score of two, which placed A.E.F. in the low risk range.
As noted earlier, A.E.F. attacks the use of these evaluations in two ways. First, he contends that Drs. Zeiguer and Barone placed undue reliance on these prior forensic evaluations and, second, that the evaluations themselves were inadmissible hearsay since they did not fall within N.J.R.E. 703. As to the first, the record simply does not support A.E.F.'s argument. While both testifying doctors reviewed these prior evaluations and the SVPA clinical certificates, they did not rely upon them as did the experts in E.S.T. Here, the prior evaluations were in large part helpful to A.E.F. Dr. Gnassi in 1979 and Dr. Blandford in 1990 both found an absence of the repetitive/compulsive sexual behavior required for ADTC confinement. Dr. McNeil in 1998 found no indications of paraphilia and "none of the cognitive distortions frequently associated with untreated sexual offenders," while Dr. Slonim in 2000 and Dr. Vaughn in 2002 concluded that A.E.F.'s problems were directly related to his drug use and not the result of any psychopathology. Indeed, counsel for A.E.F. argued strongly in summation that these prior evaluations undermined the testimony of Drs. Zeiguer and Barone. It was not until Dr. Streete's risk assessment in 2003, that any doctor concluded that A.E.F. represented a high risk of reoffense. Indeed, most telling, is that Dr. Zeiguer took into account the 1979, 1990, 2001, and 2002 evaluations but discounted them as being based to a great extent on A.E.F.'s unreliable self-reporting. Dr. Zeiguer clearly adhered to his own evaluation of A.E.F. under the relevant DSM criteria, and not that of others. Similarly, Dr. Barone was also critical of the *614 conclusions reached in the earlier evaluations, suggesting that A.E.F., who she termed a "compulsive liar," deceived some of the evaluators, and stating that she disagreed with the prior assessments.
Thus, the present case is far different from E.S.T. Here, both experts based their opinions on their own evaluations of A.E.F., and did not simply agree with the opinions of other, nontestifying examiners. To the contrary, they eschewed reliance on those prior evaluations except to the extent that they demonstrated how deceptive and manipulative A.E.F. could be. These same facts also answer A.E.F.'s argument that the prior evaluations were hearsay. We need not revisit our holding in E.S.T. that forensic evaluations do not come within the scope of N.J.R.E. 703, since here the conclusions of the earlier evaluations did not prejudice A.E.F. but, if anything, helped him, as demonstrated by his counsel's use of them in summation. Had the situation been otherwise, that is, if the earlier evaluations had supported the opinions of the testifying experts, a more difficult analysis on our part would be necessary. But that is not this case. The admission of the opinions expressed in the prior evaluations was clearly harmless in this case.
A.E.F. further contends that the commitment determination "was based to a great extent upon allegations related to [his] criminal conduct that were never admitted by [him] by way of a plea or found by a jury; nor were those allegations ever proven in the SVPA hearing." A.E.F.'s brief on this issue does not specifically identify the unproven criminal conduct in issue. However, our review of the record indicates that the only crime considered by the experts that did not result from a plea or jury verdict was the August 4, 1981 sexual assault on a thirty-one year old woman, the details of which we have outlined earlier. That conduct resulted in an indictment which was later dismissed due to the victim's unwillingness to proceed, particularly after A.E.F. had been tried and sentenced for the earlier, April 1981 offense. Nevertheless, the offense was never the subject of a judicial finding, by plea or jury verdict, and it does not appear that A.E.F. admitted the offense in his various interviews over the years. When questioned by Dr. Zeiguer, he claimed that he had no memory of the incident.
If this unproven allegation had provided a significant building block in the opinions of Drs. Zeiguer and Barone, it would present a troubling issue since significant state action, such as SVPA commitment, cannot and should not be based on unproven allegations of misconduct. While the August 1981 victim's sworn grand jury testimony, which was reviewed by Dr. Barone, is more reliable than unsworn statements contained in police reports, it is still unproven and, more significantly, not subject to cross-examination by the accused or his representative. See E.S.T., supra, 371 N.J.Super. at 574 n. 5, 854 A.2d 936; cf. Shepard v. United States, ___ U.S. ___, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005).
In any event, we find no need to deal with this potentially thorny issue. Here, undoubtedly in recognition of the unproven nature of the August 1981 allegations, each expert at the commitment hearing was specifically asked if their opinion would be the same without consideration of that incident and each responded affirmatively. We are bound by the hearing judge's implicit acceptance of that testimony by virtue of his general finding that the witnesses were credible. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974).
To the extent that A.E.F.'s claim relates to information concerning the offenses contained in pre-sentence investigation reports *615 (PSI), we have consistently rejected similar claims. E.S.T., supra, 371 N.J.Super. at 576, 854 A.2d 936 (citing In re Civil Commitment of J.M.H., 367 N.J.Super. 599, 611-614, 845 A.2d 139 (App.Div. 2003), certif. denied, 179 N.J. 312, 845 A.2d 137 (2004)). However, even such information should not be accepted uncritically. The information found in the PSI under "Offense Circumstances" cannot be relied upon in all cases to reflect the underlying events. That information is generally compiled by the probation officer from police reports and frequently does not comport with the factual basis provided by a defendant in a plea colloquy nor, if the case is tried, the evidence adduced at trial. Even after a trial, a verdict of guilty does not mean that the judge or jury found all the facts as recited in the initial investigative reports. And while the PSI supplies a place for a defendant to provide his version of the offense, most often, in our experience, defendants do not provide additional information. As a result, for an expert to use the PSI information as a basis for an opinion in SVPA cases, particularly where the committee denies the "official" version of the offense, poses troubling questions of fairness. Clearly, experts may not reasonably rely on inaccurate information in forming opinions. See N.J.R.E. 703. We do not read our opinion in J.H.M., supra, 367 N.J.Super. at 611-14, 845 A.2d 139, to provide carte blanche for the use of PSI information by experts. In this case, however, our review persuades us that there was no improper use of PSI information.
Nevertheless, we caution that there is a thin line to be tread in these cases. Many of the committees have served long sentences in state prison without receiving any necessary sex offender therapy, even when, as here, it has been specifically recommended. Thus, when the time for SVPA consideration arrives there are often no traditional treatment records available to be considered by the testifying experts under N.J.R.E. 703. And when there are prior evaluations, as in this case, they were invariably generated for forensic, not treatment, purposes.
This unfortunate state of affairs leads to the question of what the testifying experts can consider in reaching their conclusions. We made clear in E.S.T. that the experts at the hearing cannot simply parrot the findings of the doctors who author the clinical certificates, nor are those certificates the type of material that should be relied on pursuant to N.J.R.E. 703, particularly since the certificates are generated for the same purpose as the in-court testimony, i.e., the commitment of the individual in question. This is particularly true when the clinical certificates themselves contain little in the way of analysis, as is often the case, and was the case here.[6] Our opinion in E.S.T. should not, however, be read to preclude reliance, in part, on prior evaluations conducted for other purposes, such as ADTC and other psychiatric evaluations conducted in connection with sentencing or for parole consideration, see In re Commitment of J.S.W., 371 N.J.Super. 217, 225, 852 A.2d 1107 (App.Div. 2004), as long as the opinion ultimately rendered at the initial commitment hearing is that of the witness based on his or her own evaluation of the committee, prior offenses, and objective test data.[7] Prior *616 evaluations may be considered but should be utilized carefully in recognition of their hearsay nature. As we have emphasized, N.J.R.E. 703 is not designed to provide a basis for wholesale and uncritical admission of prior forensic evaluations, particularly given the complex nature of the psychiatric diagnoses involved. See N.J.R.E. 808; In re Commitment of A.X.D., 370 N.J.Super. 198, 202, 851 A.2d 37 (App.Div. 2004); Nowacki v. Community Medical Center, 279 N.J.Super. 276, 284, 652 A.2d 758 (App.Div.), certif. denied, 141 N.J. 95, 660 A.2d 1194 (1995); Lazorick v. Brown, 195 N.J.Super. 444, 451, 480 A.2d 223 (App.Div.1984). As we pointed out in Nowacki, supra, 279 N.J.Super. at 284-85, 652 A.2d 758, "admission of such supporting facts and data [under Rule 703] would nullify the court's authority to exclude hearsay of a complex medical condition under N.J.R.E. 808 and prior case law." We expect the SVPA hearing judges to carefully scrutinize this material so that its use is not abused. In re G.G.N., supra, 372 N.J.Super. at 56, 855 A.2d 569. And the same may be said of factual information concerning the committee's offenses contained in PSIs or in medical evaluations, where the committee denies that the crime took place as reported. The fact that the testifying expert parrots Rule 703, that such hearsay is of a type "reasonably relied upon" by experts in their field, does not shield all such hearsay from scrutiny. To the extent that J.H.M., supra, 367 N.J.Super. at 612-613, 845 A.2d 139, suggests otherwise, we believe it goes too far. Important rights are at stake and judicious use of hearsay must be the standard.
Finally, A.E.F. contends that the State failed to prove that he was subject to SVPA commitment. Having concluded that the testimony of Drs. Zeiguer and Barone, and with limited exception the documents upon which they relied, were properly admitted, we reject this argument as without merit. We give utmost deference to the commitment finding and reverse only for a clear abuse of discretion. In re Commitment of V.A., 357 N.J.Super. 55, 63, 813 A.2d 1252 (App.Div.), certif. denied, 177 N.J. 490, 828 A.2d 917 (2003). The record amply supports Judge Freedman's findings that the requirements for commitment were proven by clear and convincing evidence. In re Commitment of W.Z., 173 N.J. 109, 130-32, 801 A.2d 205 (2002).
Affirmed.
NOTES
[1] A.E.F.'s criminal history also included many offenses containing no suggestion of sexual activity, such as filing a false police report, possession of marijuana under twenty-five grams, larceny, and writing a bad check. Many of the prior convictions were disorderly persons offenses.
[2] On April 15, 1974, A.E.F.'s probation was revoked and he was sentenced to six months in the county jail.
[3] The use of actuarial instruments such as the Static 99 and the MnSOST-R was approved in In re Commitment of R.S., 339 N.J.Super. 507, 773 A.2d 72 (App.Div.2001), aff'd, 173 N.J. 134, 801 A.2d 219 (2002), and they are routinely employed in SVPA cases. See, e.g., In re Commitment of G.G.N., 372 N.J.Super. 42, 51-52, 855 A.2d 569 (App.Div.2004).
[4] As we explained in E.S.T., 371 N.J.Super. at 569 n. 3, 854 A.2d 936, a score of thirteen and above carries an 88% recidivism rate. See also In re Commitment of G.G.N., supra, 372 N.J.Super. at 52, 855 A.2d 569.
[5] In E.S.T., we noted the absence of treatment during his seventeen-year confinement and questioned whether there was a "realistic possibility that [he] is now amenable to treatment for a mental condition for which he received no treatment in the years when it might have done him some good, i.e., closer to the time of the offenses[.]" E.S.T., supra, 371 N.J.Super. at 578, 854 A.2d 936. The same may be said of A.E.F.
[6] Given the importance of the certificates in initiating the commitment process it may be appropriate that more analysis be required, rather than simply checking off the appropriate preprinted language.
[7] Of course, review hearings will have the benefit of actual treatment at the STU, a more traditional subject for Rule 703 admissibility. Id. at 226-27, 852 A.2d 1107.