# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1825-19

IN THE MATTER OF THE
CIVIL COMMITMENT OF
J.P., SVP-802-19.

_____

Submitted April 13, 2021 – Decided June 3, 2021

Before Judges Moynihan and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. SVP-802-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Patrick Madden, Assistant Deputy Public Defender, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Stephen Slocum, Deputy Attorney General, on the brief).

PER CURIAM

J.P. appeals from a judgment—entered after a two-day hearing during which the committing judge heard testimony from two expert witnesses—civilly

committing him to the Special Treatment Unit (STU) pursuant to the New Jersey Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38.

In order to involuntarily commit a defendant under the SVPA, the State is required to prove by clear and convincing evidence, N.J.S.A. 30:4-27.32(a), the defendant is an

> individual [who] has been convicted of a sexually violent offense; . . . that he [or she] suffers from a mental abnormality or personality disorder; and. . . that as a result of his psychiatric abnormality or disorder, "it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend."
>
> [In re Civil Commitment of R.F., 217 N.J. 152, 173 (2014) (quoting In re Commitment of W.Z., 173 N.J. 109, 130 (2002)).]

See also N.J.S.A. 30:4-27.26. The State also has the burden of proving the committee poses "a threat to the health and safety of others because of the likelihood of his or her engaging in sexually violent acts." W.Z., 173 N.J. at 132. Because the record evidence found by the committing judge supports his finding that the State met its burden, we affirm. See R.F., 217 N.J. at 175.

J.P. had been sentenced to an aggregate twenty-year prison term, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and committed to the Adult Diagnostic and Treatment Center (ADTC), for first-degree kidnapping, N.J.S.A. 2C:13-1(b)(1), and second-degree sexual assault, N.J.S.A. 2C:14-2(b), of a nine-

year-old girl—collectively, the index offense. In the committing judge's oral opinion, he recounted the testimony of Dr. Roger Harris, who was "qualified as an expert psychiatrist without objection," regarding two interviews he had conducted with J.P. Initially, J.P. denied touching or using any force against the young girl and denied being aroused by her at first. But he admitted to Dr. Harris that he had spent six hours with the child while poolside at a party and, when the child's relative suffered a medical emergency, J.P. took her from the party, subsequently removed her bathing suit and rubbed her with a lubricant. The girl suffered abrasions to her vagina, chest and thighs.[1]

As the committing judge found, and as conceded in J.P.'s merits brief, "there is no dispute that [J.P.] was convicted of a sexually violent offense, as defined by the statute[,]" N.J.S.A. 30:4-27.26. Thus, the only arguments defendant raises relate to the second and third prongs of N.J.S.A. 30:4-27.26 defining "[s]exually violent predator." See R.F., 217 N.J. at 173.

Dr. Justyna Dmowski testified for the State "as an expert psychologist without objection." J.P. contends the doctor said "she could diagnose J.P. with

---

[1] The plea transcript and other documents describing the crime, referenced in the hearing transcript, were not provided in the record. Although the committing judge recited some details of the assault from the evidence, he did not make clear that he found those details as facts. See R. 1:7-4(a). We, therefore, recite only those facts that were confirmed by J.P.

A-1825-19

pedophilia even though the definition put forth in the Diagnostic and Statistical Manual, 5th edition, requires a six[-]month period of troubling behavior, not simply a one[-]time, one[-]day act like the one [that] resulted in [J.P.'s] conviction." As such, he argues Dr. Dmowski would have had "to use the non-convictions as additional support" for her diagnosis "which was what this court warned trial courts not to allow" in In re Civil Commitment of A.E.F., 377 N.J. Super. 473 (App. Div. 2005).

The A.E.F. decision contained no such warning. We recognized a victim's grand jury testimony, that had been reviewed by one of the State's two testifying doctors, was "unproven and, more significantly, not subject to cross-examination by the accused or his representative," and observed if the "unproven allegation had provided a significant building block in the opinions of [the State's doctors], it would present a troubling issue since . . . [an] SVPA commitment, cannot and should not be based on unproven allegations of misconduct." Id. at 490. But, we found "no need to deal with [that] potentially thorny issue." Ibid.

Nor do we have to here. As the committing judge found "based on the uncontradicted testimony of the State's experts, which [the judge] credit[ed]," J.P. "suffers from mental abnormalities and a personality disorder," thus

satisfying the second statutory prong. The committing judge's finding that the State's experts' conclusions were amply supported by the record is borne out by the evidence adduced at the hearing.

Dr. Harris diagnosed J.P. with "pedophilic disorder, girls, not exclusive"; "[o]ther specified paraphilic disorder, underage teenage girls"; "antisocial personality disorder"; and "substance abuse disorders[,] . . . includ[ing] alcohol, cannabis and PCP." Dr. Harris based his diagnosis of pedophilic disorder on J.P.'s "arousal to under[]age children." The doctor acknowledged J.P. had only one conviction for sexual offenses against a prepubescent child but opined "the characteristics of that arousal as [per] his report, while at the ADTC, and partially [in] his report to me, clearly indicate an arousal to prepubescent children, which he acted upon." He added "[t]here were other allegations but they were not proven."

Among J.P.'s admissions Dr. Harris alleged were (1) J.P.'s plea to a 1991 charge of battery in Illinois where he hit a fifteen-year-old victim in the breast while fighting with her father; (2) grabbing the buttocks of a friend's fifteen-year-old daughter; and (3) grabbing a fourteen-year-old girl in Germany when he was seventeen years old. J.P. also admitted to Dr. Harris that he had a past "arousal to [fifteen]-year-olds." When later asked about them, J.P. told Dr.

Harris he had started drinking after finding his father's liquor cabinet and "would take advantage of everybody. It didn't matter how old they were. I was drunk. Many times I would wake up in the [c]ounty [j]ail, and they would dismiss the charges and I would go right out and get in trouble again. I was aroused. It could be anybody."

Dr. Harris's diagnosis of paraphilic disorder was based on the same proofs that evidenced "the pattern of [J.P.] having, or attempting to have sexual contact with under[]aged teenage girls."

Antisocial personality disorder was deemed an appropriate diagnosis by Dr. Harris because J.P. "demonstrated a profound disregard for the rights of others" by failing to "conform to social norms, as indicated by his sexual and non-sexual offenses, his violating probation [and] parole." The doctor had previously testified about J.P's convictions and adjudications for non-sexual offenses. The doctor also cited other factors supporting the diagnosis that had no relation to any non-convictions including "impulsivity," "consistent irresponsibility" and "lack of remorse."

J.P.'s self-reported longstanding alcohol use and daily marijuana use from age sixteen to 2004, daily use of cocaine and PCP, and other evidence of substance abuse, supported Dr. Harris's substance abuse diagnoses.

6

A.E.F., where the committee contended the "commitment determination" was based on unproven allegations, 377 N.J. Super. at 489, is inapposite because J.P.'s non-convictions did not provide a "significant building block" buttressing Dr. Harris's opinion that J.P. should be committed; the non-convictions did not even buttress the doctor's diagnosis which was only part of the evidence that led to his conclusion that commitment was required. Even if Dr. Dmowski used non-convictions in formulating her pedophilia diagnosis, the record evidence—Dr. Harris's testimony about any of J.P.'s several diagnoses, as credited by the committing judge—was sufficient to prove the second statutory prong based upon J.P.'s convictions and admissions.

Defendant contends "Dr. Harris was also as guilty in providing incredible evidence by testifying about his dismissed indictments and uncharged accusations as if they happened, even with the [committing judge] acknowledging that there was inadmissible hearsay within his testimony." J.P. did not specify what hearsay the judge admitted or how it was inadmissible. As such, we will not address that undeveloped argument. See Gormley v. Wood-El, 218 N.J. 72, 95 n.8 (2014); Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011). Further, we defer to the committing judge's credibility determinations, made after having had the opportunity to hear and see the

witnesses.  See R.F., 217 N.J. at 174-75; In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997).

Contending "the State failed to meet its clear and convincing burden that [he] was highly likely to re-offend," J.P. argues "[t]he judge should not have credited the [S]tate on its risk assessment of J.P. in terms of what his statistical risk is on paper, and then on the issue of mitigation of his risk through participation in therapy."

The first part of that argument centers on the inclusion by both State's experts in their "false analyses of [J.P.'s] risk to re-offend," of "allegations that did not lead to either an admission of guilt . . . [by] J.P., []or lead to a finding by a court of proof beyond a reasonable doubt."

During his testimony, Doctor Harris reviewed six allegations that did not result in convictions:  a rape accusation by a fifteen year old in 1975; aggravated sexual assault and criminal sexual contact of J.P.'s five-year-old and three-year-old daughters in 1983; a domestic violence incident with an allegation of sexual assault in 1985; aggravated criminal sexual abuse of a fifteen year old in Illinois in 1991; aggravated sexual assault, criminal sexual contact, endangering the welfare of a child, and an unspecified criminal attempt in 1993; and sexual assault by penetration and endangering the welfare of a child in 1994.  Dr.

8

Dmowski recounted the same history but said J.P.'s versions of some events differed from those he gave Dr. Harris. Dr. Dmowski testified J.P. admitted touching the buttocks of a girl who was then between thirteen and seventeen years old in 1991 and the buttocks of a fourteen-year-old girl in 1994.

Although Dr. Harris acknowledged he had given "weight" to some unproven allegations because it has been "demonstrated empirically that charges are significant in predicting the risk to sexually reoffend.[2] That [has] been proven empirically and that's why it's included in all risk assessment tools, including the Static 99 and 99R." The doctor also explained the charges "illustrate[] patterns of behavior in terms of . . . how an individual is attempting to gain access to targets, whether they are embedding themselves in families, or gaining access through friendships, or just attempting to touch strangers." He also said the charges give "a pattern in two age groups" and age groups to which

---

[2] In one instance, when Doctor Harris testified about the 1985 aggravated sexual assault, aggravated assault and robbery charges that were later dismissed by J.P.'s ex-girlfriend, and were described by J.P. to the doctor as an argument over a phone call to the ex-girlfriend from another man, the committing judge asked the doctor how he dealt with the conflicting versions. The doctor replied that he did not "put a lot of weight on this . . . particular arrest or the outcome of it" and it was "difficult to draw any conclusion from this, other than [J.P.] having unstable relationships and his being impulsive."

A-1825-19

an individual is aroused. "[A]bove a certain threshold [the charges] have been empirically shown to carry weight in terms of risk to sexually reoffend."

Dr. Dmowski testified convictions carried more weight, but non-convictions "are counted as . . . charges on the [Static 99], so they inform the risk, as well as they show off the patterns of behavior."

In his merits brief, J.P. concedes "the Static-99 allows for the counting of charges in the computation of risks." See A.E.F., 377 N.J. Super. at 480 n.3 ("The use of actuarial instruments such as the Static 99 and the MnSOST-R was approved in In re Commitment of R.S., 339 N.J. Super. 507 (App. Div. 2001), aff'd, 173 N.J. 134 (2002), and they are routinely employed in SVPA cases."). We have observed the likelihood of prejudice is reduced when "[a]n experienced judge who is well-informed as to the character of the actuarial instruments and who is accustomed to dealing with them" reviews evidence relating to those instruments. R.S., 339 N.J. Super. at 539. "The judge can accord the appropriate weight to actuarial assessments in any given case, or reject them." Id. at 539-40.

The committing judge did not err in considering the Static-99 results. The scores were but one piece of evidence the experienced committing judge[3] used in concluding the State had met its burden with regard to the third statutory prong. The committing judge recognized that the Static-99 scores that placed J.P. "in a group of individuals who offend at an above-average risk when released" did not "address [J.P's] dynamic factors, psychological factors, which have shown to place individuals at risk beyond what is measured by actuar[ial] instruments." Even the State's experts did not give the actuarial evidence much weight in their overall assessment of J.P. In his merits brief, J.P. stated the State's doctors deemed "the Static-99 [to be] just one piece of data that goes into a formulation of risk." Dr. Dmowski said the Static-99R "score of [five], which is above average," "describes a risk category that [J.P.] belongs to, that is off other sexual offenders that have scored the same." The doctor admitted the score did not "describe his individual risk." And we do not see that Dr. Harris even testified to the actuarial score he noted in his report.

We also reject J.P.'s final argument that the committing judge erred by "not properly factoring in the twelve years of therapy J.P. participated in at [the]

---

[3] We note the committing judge was also the judge in <u>R.S.</u>, <u>id.</u> at 512, and had added eighteen years to his considerable experience when this hearing took place.

ADTC." He contends his progress in treatment was evidenced by ADTC reports that "discuss[ed] what goals J.P. met while in therapy showing he was a consistent participant, discussed his own issues, and completed treatment modules[,] some of which he'd be asked to repeat if he were committed as an SVP." He also points to testimony from Dr. Andrew Greenberg, a licensed psychologist at the ADTC, a fact witness "who[,] while not directly involved in J.P.'s treatment[,] acknowledged that he met and maintained a high level of treatment at the ADTC," attaining level IV status.

J.P. acknowledges the reports and testimony of Doctors Harris and Dmowski set forth their opinions that "J.P. did not make meaningful gains in sex offender treatment." Because the State's witnesses' opinions conflicted with the evidence favorable to J.P., he argues the committing judge should have determined the State did not meet its burden that he required additional therapy.

The committing judge considered that ADTC records showed J.P. "did engage in treatment more in the latter years of his stay at the ADTC" and indicated he had "gained in treatment." He also acknowledged Dr. Dmowski's concessions that J.P. did not have any institutional infractions at the ADTC, "moved up in treatment," and attended treatment consistently. But the committing judge also discerned the records reported his "inability to address

his prior charges[,] dismissed or not, and this prevented him from exploring his deviant arousal. It also raise[d] questions about his honesty."

The judge took particular note of the differences between J.P.'s statements to Dr. Harris, which the doctor described during the hearing:

> [I]n [August] in 2019, he goes from . . . a fair description of the instant offense, and starts taking responsibility for the six charges and one conviction for his having contact with primarily teenage girls, so he's taking some responsibility for that, which he never did at ADTC, to October 2019, where he, certainly it appears that he's using a different strategy, where he becomes glib, that he has no sexual problem, that it is only alcohol. And now that he has been free of alcohol for so long, he poses no problem.

The committing judge concluded J.P. "minimized his index offense," at one point denying he touched the nine-year-old victim he abducted, and "did not demonstrate relapse prevention skills, or an understanding of his deviant cycle or what is high risk." The judge credited Dr. Harris's opinion and found J.P. was "really still in the early stages of treatment, despite what the ADTC says he accomplished." He also cited to Dr. Dmowski's testimony and found J.P.

> struggled at the ADTC, and when he talked about his charges and offenses, he said he could give feedback but he couldn't take it. He has impression management, and when she spoke to him he did not present with good relapse prevention knowledge. He told her all he needs to do is not drink. He doesn't understand the cycle. He blames substance abuse. He needs to understand his

dynamic so he can interfere and intervene with his triggers. He also has insufficient knowledge of substance abuse, saying "I'm not going to drink" is not enough.

The evidence justified the committing judge's conclusion that, despite years of participation in therapy, J.P. had not progressed and "would have serious difficulty controlling his sexually violent behavior, particularly if he returned to substance abuse." Even if this was a close case—which we neither perceive or suggest—we should not disturb a trial judge's decision that "all evidence or inference conflicts in favor of one side." R.F., 217 N.J. at 175 (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). "Trial judges who handle SVPA commitment hearings generally possess expertise and experience in highly complex matters where credibility decisions must be made, expert psychiatric testimony assessed, future conduct predicted, and individual liberty weighed against public safety." Id. at 172.

The committing judge's decision also rested upon his findings that J.P.'s "mental abnormalities" as diagnosed, even if mitigated by his age, together with his "deviant arousal," "antisocial attitudes and behaviors," "impulsive and hedonistic lifestyle," "conflicts with relationships," "poor cognitive problem[-]solving skills and poor self-regulation" all "contribute[d] to his high risk" of

14

reoffending. As such, we see no "clear mistake" that would justify our modification of the judge's decision to commit J.P. See R.F., 217 N.J. at 175.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1825-19