# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2750-23

IN THE MATTER OF THE
CIVIL COMMITMENT
OF J.M.B., SVP-358-04.[1]

Submitted September 8, 2025 – Decided October 23, 2025

Before Judges Sabatino and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. SVP-358-04.

Jennifer N. Sellitti, Public Defender, attorney for appellant J.M.B. (Phuong V. Dao, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent State of New Jersey (Melissa H. Raksa and Sookie Bae-Park, Assistant Attorneys General, of counsel; Stephen J. Slocum, Deputy Attorney General, on the briefs).

Appellant filed a pro se supplemental brief.

---

[1] We use initials to refer to appellant and his victims because records pertaining to civil commitment proceedings under the SVPA are deemed confidential under N.J.S.A. 30:4-27.27(c) and are excluded from public access pursuant to R. 1:38-3(f)(2).

PER CURIAM

Appellant J.M.B. appeals from the trial court's April 3, 2024 order continuing his involuntary civil commitment to the Special Treatment Unit ("STU") pursuant to the Sexually Violent Predator Act ("SVPA"), N.J.S.A. 30:4-27.24 to -27.38. We affirm.

I.

We incorporate by reference the background described in our published opinion upholding appellant's initial commitment in 2004 to the STU, In re Commitment of J.M.B., 395 N.J. Super. 69 (App. Div. 2007), and the Supreme Court's subsequent opinion affirming that decision, In re Commitment of J.M.B., 197 N.J. 563 (2009) (confirming that J.M.B.'s convictions constitute "sexually violent offenses" under the SVPA).

As detailed in those opinions, appellant has an extensive criminal history spanning from 1977 to 2000, including both sexually motivated crimes as well as non-sexual offenses. Our 2007 opinion concluded that, although appellant had not been convicted of one of the predicate sexual offenses specifically enumerated in the SVPA, his conviction of multiple other offenses against minors factually satisfied the statute's "catchall" provision, N.J.S.A. 30:4-27.26(b). J.M.B., 395 N.J. Super. at 92. We also rejected appellant's arguments

A-2750-23

that the application of the SVPA to him is unconstitutional.  Id. at 97-98.  As noted, the Supreme Court affirmed our determinations.  J.M.B., 197 N.J. at 601.

Now seventy-three years old, appellant contends that he does not meet the criteria for civil commitment.  His ongoing commitment[2] was the subject of an evidentiary hearing on February 23, 2024, at which appellant represented himself with the assistance of standby counsel.

At the hearing, the trial judge heard expert testimony from an evaluating psychiatrist, Roger Harris, M.D., and a psychologist, Paul Dudek, Ph.D.  Both Drs. Harris and Dudek testified for the State.  The experts collectively diagnosed appellant with sexual sadism disorder, paraphilic disorder, antisocial personality disorder, and alcohol use and cannabis use disorders.  They both opined that appellant has failed to engage in sexual offender treatment at the STU and continues to present a high risk of sexual recidivism.  Appellant testified at the hearing on his own behalf, and did not present an opposing expert.

The SVPA sets forth three prerequisites for initial and continued commitment.  A person must have been:  (1) "convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent

---

[2]  There is no indication in the record that J.M.B. has appealed his continued civil commitment orders between 2004 and the present matter.

offense, or . . . charged with a sexually violent offense but found to be incompetent to stand trial;" (2) suffer "from a mental abnormality or personality disorder" predisposing him to commit acts of sexual violence; and (3) as a result of that mental abnormality or personality disorder be "likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26. The February 2024 review hearing focused mainly on the latter two elements, as the first element of a qualifying conviction had already been determined to be fulfilled by this court and our Supreme Court.

On April 3, 2024, the judge rendered a detailed twenty-one-page written decision and entered an order that continued appellant's commitment. After weighing the evidence, the judge concluded the State's experts were credible and the State had proved by clear and convincing evidence that appellant met the standard for all three commitment prongs and was highly likely to reoffend.

Through his appellate counsel, J.M.B. now raises the following arguments on appeal:

POINT I

GIVEN A SIGNIFICANT CHANGE IN J.[M.]B.'S AGE, THE EVIDENCE DOES NOT SHOW BY A CLEAR AND CONVINCING STANDARD THAT J.[M.]B. REQUIRES ONGOING CIVIL COMMITMENT.

4

POINT II

THE TRIAL COURT FAILED TO CARRY OUT ITS
ROLE AS A GATEKEEPER BECAUSE IT IGNORED
THE EVIDENCE SUBMITTED BY J.[M.]B.

In addition, appellant raises the following points[3] in a self-represented

supplemental brief:

SUPPLEMENTAL POINT I

The Court Erred When It Relied On Unfounded
Information Regarding the Appellant's Psychiatric
Abnormality or Disorder in the Predicate Offenses.

SUPPLEMENTAL POINT II

There Are No Licensed Psychiatrists in the Special
Treatment Unit Overseeing D.O.H. Employees Who
Are Employed by the Special Treatment Unit.

SUPPLEMENTAL POINT III

Mr. Dudek, Ph.D., Practices Medicine Without a
Medical License and Makes Medical Diagnoses as a
Psychiatrist and Prescribes Courses of Treatment That
Only a Psychiatrist Can Prescribe.

SUPPLEMENTAL POINT IV

In Accordance to the Beginning of the [SVPA]
N.J.S.A., 30:4-27.24 to 30:4-27.38., Appellant is
Supposed to be Interviewed by a Psychiatrist of His
Treatment Team.

---

[3] The supplemental brief was handwritten by the appellant, whose points are reproduced with minor non-substantive grammatical changes.

SUPPLEMENTAL POINT V

Appellant Has Never Been Criminally Sentenced To: Megan's Law, CSL, PSL, or Anything Else Which Would Require an Electronic Monitor Bracelet.

SUPPLEMENTAL POINT VI

Static 99 Has Not Been Updated for the Rehearing.

II.

Having fully considered these arguments, we affirm, substantially for the sound reasons expressed by the trial judge in her written opinion. We add the following words of amplification.

The scope of appellate review of judgments of commitment is extremely narrow. In re Commitment of R.F., 217 N.J. 152, 174-75 (2014). "[C]ommitting judges under the SVPA are specialists in the area," whose "expertise in the subject [is entitled to] special deference." In re Civ. Commitment of R.Z.B., 392 N.J. Super. 22, 36 (App. Div. 2007) (quoting In re Civ. Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)). The trial court's commitment determination will be subject to modification on appeal only where "the record reveals a clear mistake." R.F., 217 N.J. at 175. Further, an appellate court must give special deference to the trial court's findings "because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case,

6

which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Johnson, 42 N.J. 146, 161 (1964)); see also In re Commitment of M.L.V., 388 N.J. Super. 454, 468 (App. Div. 2006).

The testimony of the State's two experts, uncontradicted by any opposing experts, amply supports the trial court's determination. We recite here some pertinent excerpts from that testimony.

Dr. Harris

Dr. Harris, the State's expert psychiatrist, testified that he had conducted a face-to-face examination of J.M.B. at the STU on February 9, 2024, which lasted approximately fifteen minutes before J.M.B. terminated the examination. After the examination, he prepared a report. The sources upon which Dr. Harris relied are of the type normally relied upon by experts in his field. Although the information sources may include the diagnoses or opinions of other evaluators, Dr. Harris reached his own conclusions.[4]

---

[4] The record clearly shows that those background documents and assessments were only considered to the extent that they helped inform the experts' overall opinions, as items reasonably relied upon by others in their field. See N.J.R.E. 703; In re Civ. Commitment of E.S.T., 371 N.J. Super. 562, 576 (App. Div. 2004); In re Civ. Commitment of A.X.D., 370 N.J. Super. 198, 201-02 (App. Div. 2004). The same is true of the reported facts underlying appellant's convictions. In re Civ. Commitment of J.H.M., 367 N.J. Super. 599, 613 (App. Div. 2003).

Dr. Harris explained in his report that J.M.B.'s offenses were sexually motivated, describing how J.M.B. has "a long history of being sexually aroused [by] tying up boys. He has reported this arousal began in grade school, that he has tied up many boys, and he would get an erection when tying people up" and that J.M.B. reported to Dr. Harris his 1981 offense "was to humiliate and cause [the victim] pain. It was not sexually arousing. I[t] was gratifying at the time. I enjoyed doing this. I was a sadist. I am not now." The report also detailed how, in an evaluation in 2014 when J.M.B. discussed his 1989 offense, he stated "I took my anger out on him [the victim]. I tied him up and gave him a haircut. I was aroused to control him."

Dr. Harris diagnosed J.M.B. with sexual sadism disorder, other specified paraphilic disorder as to teenage boys, antisocial personality disorder, and alcohol and cannabis use disorders.

Dr. Harris described that the basis for the paraphilic disorder was J.M.B.'s history of "recruiting underage boys . . . for his sexual gratification." The antisocial personality disorder diagnosis was based on J.M.B.'s "pervasive pattern for disregarding and violating others, failure to conform to social norms, being impulsive, irritability and aggressiveness, reckless disregard for the safety of others and a lack of remorse."

8

Although Dr. Harris did not testify as to J.M.B.'s sexual sadism diagnosis, his expert report discussing the Severe Sexual Sadism Scale showed J.M.B received a score of 9 out of 11, exhibiting a very high preponderance of sexually sadistic behaviors.[5] This score was based on J.M.B.'s following behaviors: (1) punching one victim and ripping the hair off of two other victims; (2) tying up multiple victims; (3) knocking one victim unconscious; (4) abducting some victims; (5) controlling and humiliating victims; (6) ritualistically tying boys up, gagging them, and taping their eyes shut; (7) attempting to put an object in one victim's mouth; and (8) keeping photographs and hair taped to the photographs of some of his victims while they were bound.

Dr. Harris underscored that J.M.B. has not engaged in sex offender treatment while civilly committed and has not learned to control his sexually violent tendencies and thus is at a high risk to sexually reoffend:

> [J.M.B.'s treatment record] did <u>not</u> demonstrate that [J.M.B.] has mitigated his risk to reoffend . . . in the future. In fact, it has shown that [J.M.B.] is essentially <u>an individual who has not engaged in treatment</u> and . . . is essentially <u>an untreated man</u> who has committed sexual offenses.
>
> . . . .

---

[5] A score of 4 meets diagnostic criteria, and 7 is the median score.

[J.M.B.]'s age is mitigating. [But] I don't think it's sufficiently mitigating at all. [J.M.B] has <u>not engaged in treatment</u> and we understand that sexual arousal patterns are an enduring pattern of arousal that the individual has for their lifetime.

[J.M.B] has not engaged in treatment to learn about his offending, <u>to develop any skills that could help him from sexual offending in the future</u>, skills to help him cognitively or emotionally regulate himself. [J.M.B.] does not acknowledge the sexual components of his offending, and again, feels that he should not be at the STU.

So . . . despite some mitigation of his age, [J.M.B.] poses similar risk that he did years and years ago as . . . he has not participated, has not completed any of the basic programmatic requirements, written requirements at the STU, and is not engaged in treatment. So, I think [J.M.B.] is at <u>high risk to sexually reoffend at the present time</u>.

. . . .

I think the engine that drives [J.M.B.]'s sexual offending is both his sexual sadistic disorder as well as his arousal to teenage boys. . . . [H]is antisocial personality disorder further impairs his ability to regulate those deviant arousals as his ability to self-regulate and inhibit that arousal is diminished by his deficits from his antisocial personality disorder. If [J.M.B.] is additionally intoxicated, that would certainly lower his threshold more for sexual offending.

. . . .

I certainly think he's capable of offending and . . . his access to victims is relatively easy by just driving

10

up to them and engaging them in . . . conversation. So, that's something he has repeatedly done. There's no limitation on his ability to do that at the present time.

. . . Right now, [J.M.B.] is holding himself hostage from treatment, but . . . he certainly has the potential to engage in treatment and learn about his offending.

. . . .

[H]e has not gained any of the skills that the STU offers which empirically have been shown to mitigate risk.

[(Emphases added).]

Addressing J.M.B.'s risk of future sexual reoffending, Dr. Harris further articulated that:

We know that the combination of a deviant arousal plus antisocial attitudes and behaviors are . . . correlated with future sexual reoffending.

. . . .

His Static score is a 5, which places him above average risk to sexually reoffend. He has a . . . number of dynamic factors which empirically have been shown to increase risk beyond what an actuarial instrument measures, and that is he has a deviant arousal, he has more than one paraphilia, he has antisocial attitudes and behaviors, poor self-regulation, poor cognitive problem-solving, use of sex for coping, sexualized violence, violated supervision and has led a lifestyle of impulsivity.

11

Dr. Dudek

Dr. Dudek, the State's expert psychologist, was a member of the treatment progress review committee ("TPRC") which conducted its annual review of J.M.B.'s treatment course and issued a report. The committee met in August 2023 to assess J.M.B.'s progress, but J.M.B. declined to attend the meeting.

Dr. Dudek's testimony was consistent with his expert annual report issued following the review. The sources upon which Dr. Dudek relied on are of the type normally relied upon by experts in his field. Although those sources may contain prior evaluators' diagnoses or assessments, the expert formulated his own opinions.

Dr. Dudek diagnosed J.M.B. with sexual sadistic disorder, other specified paraphilic disorder to non-consent and hebephilia (preference for children between ages 11 through 14), other specified personality disorders with antisocial and borderline features, alcohol and cannabis use disorders, and malingering.

The paraphilic disorder is based on J.M.B.'s "repetitive pattern which has manifested in bondage and aggression towards men and underage boys . . . [J.M.B.] also appears to have a sexual arousal particularly towards pubescent boys."

A-2750-23

The sexual sadistic disorder was based on J.M.B.'s "sexual offense history in which he has reported tying up approximately 20 children starting in grade school, having an erection while tying them up . . . . Records indicate he placed the boys in bondage as a means of humiliating them." Further, "[n]ot only was his behavior ritualistic in that he would tie up the boys, gag them, and put tape over their eyes, he also abducted some of his victims and kept photographs and hair of some of his victims."

Regarding the personality disorder, Dr. Dudek based this on J.M.B.'s demonstrated history of "reckless disregard for the well-being of others, impulsivity, lack of remorse, poor decision-making abilities, low frustration tolerance, deceitful and conning behavior for pleasure, and failure to conform to social norms with respect to lawful behaviors" as well as "self-mutilating behaviors and . . . a history of unstable relationships."

As for the substance use disorders, Dr. Dudek found that "[J.M.B.] has exhibited maladaptive patterns of using alcohol and marijuana. Records indicate that he has incurred several legal charges for his marijuana use and that substances played a role on his sexual offending behaviors." Dr. Dudek confirmed that J.M.B.'s sexually based offending arises primarily out of his paraphilic disorders and his sexual sadism disorder.

A-2750-23

Dr. Dudek also performed assessments of J.M.B.'s recidivism risk, utilizing the Static-99R[6] and the Sexual Violence Risk Scale,[7] Sex Offender edition ("VRS-SO"). Dr. Dudek scored J.M.B. on the Static-99R at a 5, which places him at the "[a]bove [a]verage risk for being charged or convicted o[f] another sexual offense."[8] For the VRS-SO, J.M.B.'s pre-treatment score was 42 and his post-treatment present score was also a 42 since he has failed to engage in treatment, which is "considered to be well above average" and "shows there

---

[6] "The Static–99[R] is an actuarial test used to estimate the probability of sexually violent recidivism in adult males previously convicted of sexually violent offenses." R.F., 217 N.J. at 164 n.9 (citing Andrew Harris et al., Static-99 Coding Rules Revised-2003 5 (2003)). The Static-99R score is based on ten factors: (1) age at release (score range is -3 to 1); (2) ever lived with (no two year relationship) (yes = 1, no = 0); (3) index non-sexual violence convictions (yes = 1, no = 0); (4) prior non-sexual violence convictions (yes = 1, no = 0); (5) prior sex offenses (score range is 0-3); (6) prior sentencing dates (excluding index) (yes = 1, no = 0); (7) convictions for non-contact sex offenses (yes = 1, no = 0); (8) any unrelated victims (yes = 1, no = 0); (9) any stranger victims (yes = 1, no = 0); and (10) any male victims (yes = 1, no = 0). The scores for each question are then combined to form the Static-99R score.

[7] As described in Dr. Dudek's report, "[t]he VRS – SO is an actuarial risk assessment instrument that assesses historical (static) and stable but changeable (dynamic) risk factors, as well as post-treatment change in dynamic risk using the Stages of Change Model (Prochaska & DiClemente, 1986). It is currently the only risk assessment instrument specifically normed on individuals who are incarcerated for sexual offenses."

[8] We reject appellant's self-represented argument, which is unsupported by competent expert testimony, that his score should be reduced to 3.

A-2750-23

has been no clear mediation or mitigation of risk." As Dr. Dudek explained, "[i]ndividuals with this score had approximately a 45% recidivism rate after five years and a 58% recidivism rate ten years after being exposed to risk."

Dr. Dudek testified that J.M.B. has remained in phase one[9] of treatment at the STU since his initial commitment in 2004 because he has refused to participate in treatment. Dr. Dudek further outlined J.M.B.'s lack of participation in treatment, noting that:

> [H]is participation in the treatment orientation process group has been based on discussing victim of system issues, more -- there will be more institutionally-related concerns, but he has indicated quite adamantly that he will not discuss the nature of the arrest history, his fantasies, his sexual arousal, really much of anything that would be a part of treatment at the STU.
>
> . . . .
>
> That orientation that he's maintained against engaging in treatment has kept him essentially stuck for decades.

When discussing J.M.B.'s risk of reoffending, Dr. Dudek described that:

> Well, one of the things that research on recidivism in terms of sex offending tells us is that certainly past behavior is one of the best predictors of a future behavior, and that if you look at the difference between when he was last convicted to the present and

---

[9] Treatment levels within the STU are organized up to phase three, with phase three being the most advanced.

15

the amount of treatment that he's engaged in, there has been no meaningful treatment in the sense that he could be considered an untreated sex offender, so that the permissive attitudes and arousal and the precursors to offending unlikely have changed since the time of the offenses.

Dr. Dudek also described how J.M.B.'s lack of program participation at the STU affects his risk of reoffending:

One of the concerns of that is that it comes in terms of . . . how one would develop of social support groups . . . in the community. It also creates concerns that are related to compliance with supervision, that if an individual struggles to make on a consistent basis self-help groups within the facility that it calls into question their willingness to . . . engage in self-help programming in the community if they were to be conditionally discharged.

Overall, Dr. Dudek agreed that J.M.B.'s risk of sexually reoffending was highly likely. Dr. Dudek's report notes that:

[T]here are a number of dynamic risk factors that apply in [J.M.B.'s] case. These risk factors, correlated empirically with recidivism include, social rejection, lack of concern for others, impulsivity, poor cognitive problem solving, negative emotionality, patterns of deviant sexual arousal, sexual preoccupation, and deficits in his capacity for relationships.

. . . .

While he interacts well with his peers he does not have any known positive supports that would assist him in managing dynamic risks of re-offense and shows a

16

disregard for any concern for others and their safety in regards to potential victims. Related to this is his pattern of deviant arousal that has been unaddressed in treatment and he has demonstrated while in the community little to no desire to control his sexual urges. While he had reportedly been in a long term relationship, he continued to act on his sexual urges related to his deviant sexual arousal. Additionally, he has a history of substance abuse that has also been unaddressed clinically.

We also briefly recount the substance of appellant's testimony.

J.M.B.'s Testimony

J.M.B. testified on his own behalf. He emphasized that he has never been convicted of any sex crimes and, as such, feels he does not need to partake in treatment at the STU. J.M.B. further noted that since being committed to the STU, he has had no disciplinary offenses, nor used any illicit substances.

During his testimony, J.M.B. submitted twelve documents into evidence:

1. A September 4, 2023 one-page letter typed by J.M.B. in which he denies having been convicted of a sexually violent offense.

2. A flier indicating that J.M.B. knitted and donated over 100 hats to a volunteer fire department.

3. A letter from the administrator of the South Woods State Prison noting the dates J.M.B. was incarcerated.

4. Historical Prison Summary from South Woods State Prison.

5. Burlington County Detective Division Document.

17

6. Appellate Division Document dated August 10, 2016.

7. Presentence Report, Indictment Number 006-462.

8. Plea Form for Indictment Number 006-462.

9. An excerpted page providing definitions related to the SVPA N.J.S.A. 30:4-27.26

10. A letter dated May 23, 2002 written to J.M.B. from his then-counsel confirming he was not subject to Megan's Law reporting.

11. Judgment of Conviction from December 4, 1995.

12. Judgment of Conviction from March 1, 1991.

<u>The Trial Court's Decision</u>

As noted, the trial court issued a twenty-one-page written decision on April 3, 2024, finding that the State had satisfied each prong of the SVPA by clear and convincing evidence and ordering J.M.B.'s continued civil commitment. The court recounted the procedural history of this matter, and the evidence and testimony submitted in detail. The court expressly found Drs. Harris and Dudek credible, noting their familiarity with the case, confidence in their opinions, and believable demeanors, as well as their opinions being supported by the treatment notes. The court further noted that the experts' reliance upon informational sources in forming their opinions was sound and appropriate.

The court found that J.M.B.'s present high risk to sexually reoffend and his extensive history of non-compliance with supervision in the community demonstrate that he would not be highly likely to comply with a conditional discharge plan at this time. Further, the court noted that J.M.B. "has not mitigated this risk at present through sex-offender treatment available at the STU."

Given this evidence and the trial judge's conscientious analysis of the proofs, we are unpersuaded by appellant's argument that he is now too old to present a sufficient risk of sexual re-offense to justify his continued commitment. For the reasons detailed by the two experts, the evidence manifestly shows that, despite his age, appellant continues to pose a high risk of re-offense if released. He has made negligible progress during his period of commitment and has refused to participate meaningfully in therapeutic activities.

Notably, J.M.B.'s most recent offense, involving an incident where he tied up a fourteen-year old and placed tape over his eyes, took place when J.M.B. was forty-eight years old. As found by Dr. Harris, neither J.M.B.'s age nor his physical condition would prevent him from reoffending against his "victim pool." Dr. Harris explicitly testified that he considered J.M.B.'s age as a

mitigating factor and explained that, in spite of his age, he still poses a similar risk as he did years ago because he has refused treatment. Further, as Dr. Dudek acknowledged in his testimony, the Static-99R score clearly takes into consideration the individual's age. In particular, consistent with the Static-99R actuarial scoring set forth in Dr. Dudek's report, J.M.B.'s score was reduced by three points (the maximum reduction for that characteristic) based on his age. Hence, J.M.B.'s age was properly discussed and considered, but that facet was insufficient to tip the balance against the strong reasons justifying his continued commitment.

Moreover, J.M.B.'s age and lack of treatment participation are only two of the many factors the State's experts and trial judge ultimately relied on to conclude J.M.B. had a high risk of future offenses. The judge also considered: (1) J.M.B.'s extensive criminal history of both sexual and non-sexual offenses against both children and adults; (2) his continued offenses despite multiple arrests and incarcerations including offenses while he was on parole and probation; (3) his self-perception as a victim rather than a perpetrator; (4) the cumulative effect of his sexual sadism disorder, paraphilic disorder, and antisocial personality disorder; (5) the ritualistic behaviors of tying boys up and taking trophies of their hair and over one hundred photographs of boys tied and

20

gagged; and (6) his lack of insight, poor self-control, narcissism, poor problem solving skills, poor coping mechanisms, and poor social support.

We also are unpersuaded by appellant's contention that the trial judge prejudicially overlooked material exhibits that he had submitted. Notably, the only evidence appellant's counsel relies on to challenge appellant's mental health diagnosis is the September 4, 2023 letter written by appellant himself, where he disclaims his Antisocial and Borderline Personality Disorder diagnosis.[10] The letter alleges that, to diagnose Antisocial and Borderline Personality Disorder according to the DSM-5, "one must have a juvenile record . . . which I do not have."

However, Dr. Harris testified that the DSM-5 does not require a juvenile record for Antisocial Personality Disorder. Moreover, Dr. Harris's report explains that "[t]here is evidence of conduct disorder with onset before age 15 years for [J.M.B.] and he . . . meets [the] criteria [for] this diagnosis." Likewise, Dr. Dudek explicitly noted in his testimony that J.M.B.'s sexually based offending "arises out of the . . . paraphilic disorders . . . as well as sexual . . . sadism disorder" rather than from his antisocial and borderline personality

---

[10] The letter also contends that the expert doctors misrepresented some information regarding J.M.B.'s substance use disorder diagnoses but does not claim the diagnosis as a whole is inappropriate.

disorder. J.M.B.'s layperson assertion that he does not have a personality disorder lacks credibility and does not repudiate the credible diagnoses made by Drs. Harris and Dudek.

The criminal records and documents J.M.B. submitted to argue he was not convicted of a sexually violent offense are irrelevant, as the Supreme Court already ruled on that precise issue and found J.M.B.'s criminal history and convictions qualify him for civil commitment under SVPA's catch-all definition of sexually violent offenses. J.M.B., 197 N.J. at 595. Appellant's argument is plainly barred by principles of res judicata. The preclusionary doctrine of res judicata involves elements that are all present here: common parties, common subject matters, common issues and common evidence, as well as a final judgment rendered in the first action on the merits. See Velasquez v. Franz, 123 N.J. 498, 505-06 (1991); see also Restatement (Second) of Judgments § 19 (A.L.I. 1982).

The various other documents submitted by J.M.B do not materially affect the court's analysis. The flier indicating he knitted over 100 hats for veterans, although admirable, does not affect his risk of committing future acts of sexual violence. The letter from the South Woods State Prison administrator that was used in part to dismiss one of his previous indictments does not affect the

22

Supreme Court's finding that he is a sexually violent offender. Appellant's behaviors while in State Prison are not emblematic of his risk of reoffending on release, as many of his bondage victims were underage and he was at an adult prison. The definitions of the SVPA regarding convicted sex offenders were clearly considered by the Supreme Court when finding him eligible for civil commitment. The plea agreement that failed to inform J.M.B. of the possibility of civil commitment does not affect the Supreme Court's ruling that he is eligible for civil commitment based on his criminal history.

In sum, the trial court did not abuse its discretion by failing to mention these miscellaneous pieces of evidence in its written opinion. The court's finding that J.M.B. meets the three criteria for civil commitment based on clear and convincing evidence is supported by the record and should not be disturbed on appeal.

Appellant's self-represented assertions about Dr. Dudek's alleged lack of proper credentials are without merit. The statute only requires one of the experts who attests the individual to be a sexually violent predator on admission to be a psychiatrist. See N.J.S.A. 30:4-27.28(b). Dr. Dudek, as a licensed psychologist, is manifestly qualified to make mental health diagnoses. N.J.S.A. 45:14B-2(b). In addition, Dr. Harris, who is a psychiatrist, personally assessed appellant for

23

his review hearing and extensively reviewed the pertinent treatment documents.

We reject appellant's arguments, not substantially endorsed by his attorney, that Dr. Harris was not a member of appellant's "treatment team" on the STU. In supplemental briefing, the State clarified, that although Dr. Harris maintains a private practice, he regularly provides psychiatric care and services to STU residents and functioned in this case as a member of appellant's treatment team. See N.J.S.A. 30:4-27.6 (defining "treatment team" to include "individuals, agencies or firms which provide treatment, supervision or other services" at the STU) (emphasis added). Also, appellant's stand-by counsel stipulated to Dr. Harris's qualifications to testify in this case as an expert psychiatrist with particular expertise in performing SVPA risk assessments.

We have fully considered all other arguments made by appellant through his counsel and on his own behalf, and conclude they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2750-23